A00A2079, A00A2080. MERRITT v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY et al.; and vice versa.

(544 SE2d 180)

BARNES, Judge.

Katherine Merritt sued State Farm Mutual Automobile Insurance Company and State Farm Fire & Casualty Company (State Farm) for fraud, misrepresentation, false swearing, and violations of the Racketeer Influenced & Corrupt Organizations Act (RICO), claiming that the insurance company failed to disclose the existence of a $1 million umbrella policy until after she had settled for what she thought were policy limits of $250,000. The trial court granted summary judgment to State Farm, concluding that the parties had no contract because the parties' settlement agreement was contingent on the insurance company having disclosed all applicable policies. Therefore, the trial court held, Merritt had suffered no damages. Merritt appeals the grant of summary judgment, and State Farm cross-appeals contending the trial court erred by not clearly dismissing Merritt's claims under OCGA § 51-12-6 when it dismissed Merritt's other claims. For the reasons that follow, we reverse the grant of summary judgment to State Farm.

The underlying automobile collision occurred on November 29, 1996, when State Farm's insured crossed the centerline and hit head-on the car in which Merritt was a passenger. Merritt, who was 18 and a college freshman at the time, suffered injuries to her head and face and has undergone numerous reconstructive facial surgeries. She is still a college student, but asserts that her cognitive functions are impaired.

On January 10, 1997, Merritt asked State Farm, pursuant to

OCGA § 33-3-28, for a statement under oath revealing all insurance policies under which coverage for this collision might be found. State Farm responded on January 14, 1997, with a certificate of coverage showing one automobile liability policy with maximum coverage of $250,000 per claim. In response to a second letter two days later specifically asking whether the insured had any umbrella coverage, State Farm replied on January 21, 1997, that all applicable policies had been disclosed.

On September 8, 1998, Merritt demanded $250,000 to settle her claim, stating that the demand was "contingent upon your insured's policy limits with State Farm being $250,000 and the accuracy of your representation that there is no other insurance applicable to this claim." State Farm initially countered with $200,000 on October 9, 1998, and Merritt reiterated her demand for "full policy limits" on October 14, 1998. On October 15, 1998, the company agreed to settle Merritt's claim for "policy limits of $250,000." This was sufficient to constitute an enforceable settlement of the claim. *Herring v. Dunning*, 213 Ga. App. 695 (446 SE2d 199) (1994).

After Merritt signed the insurance company's release and draft for $250,000, but before her attorney signed and negotiated it, Merritt's lawyer called State Farm's insured directly on October 27, 1998, to inquire once more whether he carried an umbrella policy. He disclosed that he did carry an additional $1 million umbrella policy with State Farm. State Farm then confirmed the existence of the umbrella policy, and both State Farm and its newly hired outside counsel informed Merritt she could keep the $250,000 as a partial payment on her claim while continuing to negotiate for more money.

Merritt demanded the entire amount of both policies on November 6, 1998, for a total of $1.25 million, in exchange for a release of claims not only against State Farm's insured, but also against State Farm itself for what she termed "deliberate concealment" of the umbrella policy. State Farm countered with an offer of $400,000 on November 17, 1998. Merritt declined the offer and filed suit against the insured for damages resulting from the collision and against State Farm for fraud, misrepresentation, false swearing, and RICO violations.

The parties hotly contest whether State Farm's failure to disclose the existence of the umbrella policy earlier was deliberate or accidental. State Farm contends that the failure to disclose the additional coverage was simply an "oversight," which occurred because the umbrella policy was not listed on the computer files that State Farm's claims representative checked when Merritt asked about coverage in January 1997.

A State Farm agent testified on deposition that the insured's umbrella policy application had not been processed by underwriting

until December 22, 1996, after the collision at issue here, and would not have been listed on State Farm's computer records when Merritt asked about coverage in January 1997. While the umbrella policy was effective the day the agent countersigned the declarations page on the application, State Farm has no procedure requiring the agent to note the coverage electronically. According to the company, until the information is manually entered into the computer files after the application is approved, the only way to discover the umbrella coverage would be to ask the agent directly. The record does not indicate why the agent was not asked about possible additional coverages.

Merritt, on the other hand, contends that State Farm's failure to disclose the existence of the umbrella policy was deliberate. The application for the umbrella policy was received in underwriting on October 24, 1996. The underwriting operations superintendent for Atlanta and the 13 surrounding counties testified that State Farm actually approved the personal umbrella policy that covers this collision on December 12, 1996. She further testified that the policy information *was* entered into the company's computer database the same day. Thus, not only was the policy in effect before the collision, but, according to this testimony, approval of the policy was also available in the database much earlier than State Farm's agent testified.

Further, a notation on a card attached to the inside of the insured's claim file noted that "a personal liability umbrella policy may exist," although the adjuster handling the claim testified that he did not notice that the card was dated after the initial State Farm representative told Merritt no umbrella policy existed. The adjuster never investigated the applicable coverage, he said, because he "felt very comfortable from [his] review of the file that previous claims, claims handlers and supervisors or team leaders had addressed that issue and the only amount of coverage available was the $250,000." The adjuster further testified that he had received no formal training on searching for umbrella policies.

Finally, Merritt cites the deposition testimony of State Farm's insured as support for her contention that the company deliberately withheld information regarding the umbrella policy. The insured testified that when he spoke to his agent regarding the collision:

A: [The agent] jokingly said don't tell anybody about the umbrella policy. I took it as a joke. And of course [the claims adjuster] was aware of the umbrella policy, because I'd mentioned it to him.
Q. When did you first mention it to [the claims adjuster]?
A. I really don't recall which conversation. I would guess that it was in each and every conversation I had with him, and I had I would say between four and six conversations with him.

After discovery, State Farm moved for summary judgment, arguing that the parties did not reach an enforceable agreement and that Merritt suffered no damages from the delay in identifying coverage because she knew about the umbrella policy before any full and final settlement. The trial court agreed, granting summary judgment to State Farm on all of Merritt's claims against it, ruling that no enforceable settlement existed and therefore Merritt could prove no damages under any of her causes of action. The trial court held:

> Plaintiff's letter of September 8, 1998 to State Farm contained contingency language stating in effect that the negotiations made by Plaintiff were only valid when based on the true and accurate policy limits of Defendant [tortfeasor]. Following the discovery of the additional policy, Plaintiff then began negotiating anew with State Farm regarding the settlement of the claim. State Farm accepted the new negotiations and made a counteroffer. All of the above actions when viewed as a whole indicate that there has been no settlement agreement between the parties to date. . . . Therefore it is the finding of this Court that there existed no settlement agreement resulting from the negotiations of October 1998. . . . As there has been no settlement agreement reached between the parties as above described, Plaintiff's alleged actual damages are nonexistent.

### Case No. A00A2079

Merritt appeals this ruling, arguing that the trial court erred in finding that the parties did not reach an enforceable settlement contract and that Merritt suffered no damages.

We are guided by *Parris v. State Farm &c. Ins. Co.*, 229 Ga. App. 522 (494 SE2d 244) (1997), in which this court affirmed a trial court's grant of summary judgment to State Farm on plaintiffs' claim for damages for failure to furnish certain insurance coverage information as required by OCGA § 33-3-28, fraud and false swearing. In that case, State Farm initially responded incorrectly to a request for coverage information. Sometime later, State Farm advised its claim supervisor that two additional policies of insurance existed, but it was not clear whether the policies actually provided coverage for this collision, and also disclosed the existence of the additional policies to Parris.

Parris filed suit about three months later, and in response to interrogatories, State Farm confirmed that all three policies provided coverage for the subject collision, but inaccurately identified the coverage limits. State Farm subsequently amended its certificates of

coverage to reflect the proper coverage amounts, and Parris settled his injury claim with full knowledge of all available coverage. We concluded that Parris produced no evidence showing that the insurance carrier would have settled sooner had the company disclosed the correct limits initially and no evidence that the outcome would have been different had they filed suit sooner. *Parris v. State Farm*, supra, 229 Ga. App. at 523-525.

Finally, we note that the *Parris* decision

> turns on the issue of damages and does not stand for the proposition that an insurance company will be protected from liability as long as full disclosure of insurance coverage precedes a settlement. Such a rule would emasculate any duties created by OCGA § 33-3-28, the laws of fraud, and the laws of false swearing. Contrary to State Farm's assertion in this case, it is not a universal truth in insurance disclosure matters that all is well that ends well. Improper insurance reporting may result in liability under a proper factual scenario. That case, however, is not before us.

Id. at 525-526. That case is before us now.

1. On appeal from a grant of summary judgment, this court conducts a de novo review of the record, construing the evidence and all inferences therefrom in favor of the nonmoving party. *Maddox v. Southern Engineering Co.*, 231 Ga. App. 802, 803 (500 SE2d 591) (1998); *Lane v. Spragg*, 224 Ga. App. 606 (481 SE2d 592) (1997).

2. We first consider whether Merritt and State Farm entered into an enforceable contract when they agreed to settle Merritt's claim against State Farm's insured for $250,000. The parties do not dispute the underlying facts, except for the issue of whether State Farm's failure to disclose the existence of the umbrella policy earlier was deliberate or accidental, and other than the condition precedent, do not dispute the enforceability of the settlement agreement.

"Whether a settlement is an enforceable agreement is a question of law for the trial court to decide," and for this court to review. (Citation omitted.) *Auto-Owners Ins. Co. v. Crawford*, 240 Ga. App. 748, 749 (1) (525 SE2d 118) (1999). A valid contract requires parties able to contract, consideration, assent to the terms, and a definite subject matter. OCGA § 13-3-1.

> A contract of compromise is binding on the parties. Compromises are favored in all enlightened systems of jurisprudence as tending to prevent litigation. . . . We know of no rule of law which places it in the power of either party to a compromise, to disregard it, if it was full and final between

the parties, as to the subject-matter of controversy.

(Citations and punctuation omitted.) *Bishop v. Intl. Paper Co.*, 174 Ga. App. 863-864 (1) (332 SE2d 12) (1985).

The trial court held that, because Merritt stated in her initial offer that any settlement was contingent on State Farm having accurately conveyed to her the existing coverage, State Farm's misstatement of coverage meant the parties had no contract. In other words, the trial court held that State Farm's own misrepresentations allowed it to disavow its earlier agreement.

State Farm argues in response to Merritt's appeal that disclosure of full coverage was a condition precedent that had to be fulfilled before the contract was valid. However, we conclude the record contains sufficient evidence from which a jury

> could have found that any nonsatisfaction of the condition precedent . . . was the result of [the defendant's] failure to exercise good faith. Where a defendant prevents the performance of a stipulation of a contract undertaken by the plaintiff, he is estopped from setting up in his own behalf any injury which may have resulted from the non-performance of such condition.

(Citation and punctuation omitted.) *Oxford Motors Co. v. Niblack*, 183 Ga. App. 771, 772 (360 SE2d 23) (1987); see also *Feagin v. Feagin*, 174 Ga. App. 474, 475 (330 SE2d 410) (1985). Moreover, the contingency provision here was clearly for Merritt's benefit and she could waive it if she chose. *Kusuma v. Metametrix, Inc.*, 191 Ga. App. 255, 257 (3) (381 SE2d 322) (1989). Therefore, the existence of the provision does not require the result reached by the trial court.

Further, Merritt has claimed fraud in the making of the contract and has elected to affirm the contract and seek damages, as is her right.

> Fraud ordinarily gives the injured party the right either to rescind the contract, or, by affirming the same, to claim damages. A suit for damages by the defrauded party for the fraud committed is not a suit for the violation of the contract, but is one for a tort and involves affirmance of the contract, and he may keep the fruits of the contract and maintain an action for the damages suffered by reason of the fraud. . . . [P]laintiff may elect whether to rescind the contract for fraud or to affirm it and sue for damages.

(Citations and punctuation omitted.) *Bill Spreen Toyota v. Jenquin*, 163 Ga. App. 855, 856 (1) (294 SE2d 533) (1982).

We hold that Merritt has established the existence of a valid settlement contract, which she has elected to affirm and on which she seeks damages for fraud, misrepresentation, and false swearing.

3. We next consider whether Merritt has presented a material issue of fact as to whether she suffered any damages as a result of this alleged fraud, misrepresentation, and false swearing.[1]

In *Parris v. State Farm*, supra, 229 Ga. App. at 524, we first noted that the legislature declined to provide a cause of action to plaintiffs for an insurance company's failure to comply with OCGA § 33-3-28. We then concluded that Parris had produced "no evidence indicating that the insurance carriers would have produced settlement sums at an earlier time had defendants initially disclosed all applicable coverage and policy limits." (Citation and punctuation omitted.) Id. at 525.

However, in this case the record contains evidence that State Farm might have produced a greater settlement sum at the date of the initial settlement, had it initially disclosed the umbrella policy. The record shows that State Farm's claims adjuster wrote in September 1998 that "this case is, without any further investigation, valued in excess of the available policy limits of $250,000." However, in November 1998, 22 months after State Farm's representative swore under oath that only a $250,000 policy covered the claim, State Farm representatives reached a "regional office decision" that Merritt's claim was worth $500,000. Thus Merritt has presented some evidence from which a jury could conclude that she lost at least the use of $250,000 for some period of time. "[T]his court has recognized damages for 'loss of use of money.' *Leon Jones Feed &c. v. Gen. Business Svcs.*, 175 Ga. App. 569, 570 (333 SE2d 861) (1985)." *Whitehead v. Cuffie*, 185 Ga. App. 351, 352 (2) (364 SE2d 87) (1987). Accordingly, the trial court erred in granting summary judgment to State Farm on Merritt's claims of fraud, misrepresentation, and false swearing, and we reverse the trial court's grant of summary judgment to State Farm on those counts.

4. Because we have found that a question of fact exists as to Merritt's damages, we must also reverse the trial court's grant of summary judgment to State Farm on Merritt's RICO claims, which was based on a finding that Merritt had suffered no damages. *Rains v. Dolphin Mtg. Corp.*, 241 Ga. App. 611, 615 (5) (525 SE2d 370) (1999).

---

[1] State Farm has conceded that, if the settlement is valid and if there is a question of fact regarding damages, Merritt has presented a justiciable question of fact as to whether State Farm committed wilful misrepresentation.

*Case No. A00A2080*

5. As we have reversed the grant of summary judgment to State Farm in the main appeal, State Farm's cross-appeal, asserting that the grant of summary judgment did not go far enough, is dismissed as moot.

*Judgment reversed in Case No. A00A2079. Appeal dismissed as moot in Case No. A00A2080. Blackburn, P. J., and Eldridge, J., concur.*

DECIDED DECEMBER 28, 2000 — 

*McClure & McClure, Kathie G. McClure, Robert Altman,* for appellant.

*Downey & Cleveland, Y. Kevin Williams, Powell, Goldstein, Frazer & Murphy, E. A. Simpson, Jr., Linda G. Birchall, Richard W. White, Harper, Waldon & Craig, J. Blair Craig,* for appellees.

*Robertson, Bodoh & Nasrallah, Mathew G. Nasrallah,* amicus curiae.