A01A0461, A01A0757. PARKSIDE CENTER, LTD. et al. v. CHICAGOLAND VENDING, INC.; and vice versa.
(552 SE2d 557)

ANDREWS, Presiding Judge.

Parkside Center, Ltd. leased space in its shopping center to Chicagoland Vending, Inc. under a lease which contained a covenant restricting Parkside from leasing other space in the shopping center to businesses competitive with Chicagoland's business. Chicagoland sued Parkside and its general partner, D. Kimbrough King, claiming the value of its leasehold was destroyed when Parkside breached the covenant by leasing space in the shopping center to a competitive business. A jury awarded Chicagoland $787,400 for damages to its leasehold plus attorney fees.

The central issue on appeal is whether the covenant was enforceable as a reasonable restriction on competition. In Parkside's appeal in Case No. A01A0461, we find that the covenant was correctly construed as a valid, reasonable restriction on competition, and that there was evidence to support the jury's verdict that Parkland breached the covenant and caused $787,400 in damages to Chicagoland's leasehold. In Chicagoland's cross-appeal in Case No. A01A0757, we conclude that the trial court properly reduced the attorney fees awarded to Chicagoland under OCGA § 13-6-11 to $74,000 and correctly directed a verdict against Chicagoland's additional claim that Parkside and King tortiously interfered with its lease rights.

Construed in favor of the verdict, evidence showed that in December 1989, Parkside, through its general partner, King, leased space in a shopping center to Chicagoland for the purpose of operat-

ing a game room containing coin-operated video and redemption[1] amusement games. The five-year lease agreement (with two five-year renewal options) contained a covenant restricting competition which provided that:

> *Exclusive.* [Parkside] agrees that it shall not install or operate amusement devices similar to those [which] are operated by [Chicagoland], in the Common Areas of the Shopping Center or other areas within the Shopping Center nor shall [Parkside] enter into a lease with a person or other entity other than [Chicagoland] for space within the Shopping Center which shall be utilized as an amusement center or other usage substantially similar to [Chicagoland's] use hereunder, except with the prior written approval of [Chicagoland]. This provision is in effect only so long as [Chicagoland] is not in default and is doing business from the Premises.

Chicagoland set up fifty-five to sixty amusement games and operated profitably for the next three years without competition from similar businesses in the shopping center. In September 1993, without notice to Chicagoland, Parkside (through King) leased space in the shopping center to Q-Lanta for the purpose of operating about 25 coin-operated amusement games identical or similar to the games at Chicagoland, along with an amusement game known as laser tag. After Q-Lanta opened its business in November 1993, Chicagoland sales and profits immediately began dropping.

On November 12, 1993, Chicagoland sued to enjoin Parkside, King and Q-Lanta from leasing the space in violation of the covenant restricting competition, but injunctive relief was ultimately denied because Q-Lanta had no knowledge of the covenant when it signed its lease with Parkside. *Chicagoland Vending v. Parkside Center*, 265 Ga. 318 (454 SE2d 456) (1995). In the face of competition from Q-Lanta, Chicagoland's business continued to lose money until the losses finally forced it to close in February 1997. In the meantime, Chicagoland dismissed Q-Lanta from its suit and amended the action to seek damages against Parkside and King for violation of the covenant and the destruction of the value of its leasehold, and for tortious interference with its lease and attorney fees under OCGA § 13-6-11.

During a jury trial in 1999, the trial court entered a directed verdict against Chicagoland on the tortious interference claim. The jury awarded Chicagoland $787,400 for damages to its leasehold caused

---

[1] Redemption games are those in which the participant earns tickets that can be redeemed for prizes.

by violation of the covenant and $140,000 in attorney fees, which included fees paid by Chicagoland in its unsuccessful attempt to get injunctive relief. In entering judgment on the verdict, the trial court reduced the attorney fee award to $74,000 to eliminate fees paid for the attempt to get an injunction.

### Case No. A01A0461

1. Parkside and King contend the trial court erred by instructing the jury to construe the covenant restricting competition and in failing to declare the covenant unreasonable and invalid as a matter of law.

Although we agree the trial court had a duty to construe the covenant, its failure to do so in this case was harmless error because the jury verdict was consistent with a proper application of the rules of contract construction to the covenant. Contract construction follows a three-step procedure. "The trial court must first decide whether the contract language is ambiguous; if it is ambiguous, the trial court must then apply the applicable rules of construction; if after doing so the trial court determines that an ambiguity still remains, the jury must then resolve the ambiguity." (Footnote omitted.) *Garrett v. Women's Health Care &c.*, 243 Ga. App. 53, 56-57 (3) (532 SE2d 164) (2000). Thus, the jury does not become involved in the process, even if the contract is difficult to construe, until there appears an ambiguity in the contract which cannot be resolved by the trial court's application of the rules of construction set forth in part in OCGA § 13-2-2. *Kusuma v. Metametrix*, 191 Ga. App. 255, 256 (381 SE2d 322) (1989).

The construction issue presented was whether the covenant restricted competition in a manner reasonably necessary to protect Chicagoland's business, or whether it was so broad that it unreasonably restricted competition and amounted to an illegal restraint of trade.

> [A]n agreement by a lessor ancillary to a leasing of a part of his property, designed to prevent the use of the remainder of his property in a manner competitive with the operation of the lessee's business, is a valid and reasonable restraint of trade . . . subject to the overriding requirements that, as to territoriality and/or duration, [such agreements] be reasonably necessary to protect the interests of the covenantee, that they not impose greater restrictions upon the covenantor than are necessary for the covenantee's protection, and that they not unduly prejudice the interests of the public.

*Webster v. Star Distrib. Co.*, 241 Ga. 270, 272 (244 SE2d 826) (1978).

Parkside contends the trial court should have concluded that the

covenant was unambiguous and imposed unreasonable restrictions by attempting to broadly restrict competition from all "amusement centers," which could include movie theaters, bowling alleys, billiards rooms, or other forms of amusement substantially different from Chicagoland's business. Accordingly, Parkside argues that the trial court should have narrowly focused on the clause in the covenant containing the term "amusement center" and used a technical grammatical construction to find that nothing modified this term to limit its restrictive effect. Taking a broader view we conclude that, considering the entire restrictive covenant in the context of the lease agreement, one could easily conclude that the intent was to restrict competition only from "amusement centers" with "usage substantially similar to [Chicagoland's] use." Accordingly, applying the principles set forth in *Webster* along with the applicable rules of contract construction would have led to two possible conclusions in the trial court.

The first is that, construing the lease and the covenant as a whole (OCGA § 13-2-2 (4)), and disregarding the technical grammatical construction urged by Parkside (OCGA § 13-2-2 (6)), the clear and unambiguous intention of the covenant was to restrict competition from "amusement centers" only to the extent they operated amusement devices substantially similar to those operated by Chicagoland. Under this construction, the covenant would clearly be a valid restraint of trade under *Webster*, and it would have been the duty of the trial court to declare the covenant valid as a matter of law. OCGA § 13-2-1; *Copy Systems of Savannah v. Page,* 197 Ga. App. 435, 436 (398 SE2d 784) (1990).

The second possibility is that, even after applying the rules of contract construction, an ambiguity remained as to whether the covenant unreasonably restricted competition or was a valid restraint of trade. Under this construction, it would have been the duty of the trial judge to submit the ambiguity to the jury for resolution. Id. at 436.

We need not decide which of these two options would have been the correct course. The jury verdict validating the covenant was consistent with the first option, so any error in the trial court's failure to construe the covenant and declare it valid was harmless. As to the second option, even if the trial court erroneously submitted the covenant to the jury without first construing it and determining there was an ambiguity, no harmful error is shown if the jury's construction is supported by the evidence. *Time Warner Entertainment v. Six Flags Over Ga.,* 245 Ga. App. 334, 344 (537 SE2d 397) (2000). In this case, the terms of the covenant and the evidence presented by the parties to explain any ambiguity provided evidence supporting the jury verdict in favor of Chicagoland — a verdict consistent with the

conclusion that the covenant was a valid, reasonable restriction on competition, and that Parkside violated it by leasing to Q-Lanta.

2. King claims the trial court erred by refusing to dismiss him from the suit on the basis that an exculpatory clause in the lease released him from any liability.

The exculpatory clause referred to by King appears as the latter portion of paragraph 22.8 of the lease beginning with the phrase "provided, however" and continuing to the end of the paragraph. Paragraph 28 reads in its entirety as follows:

> The terms, provisions and covenants contained in this lease shall apply to, inure to the benefit of, and be binding upon the parties hereto and their respective heirs, assigns, successors in interest and legal representatives except as otherwise herein expressly provided, provided, however, that all claims, demands, or causes of action which Tenant may at any time thereafter have against Landlord because of Landlord's failure to comply with any provisions hereof, shall be enforceable solely against Landlord's right, title and interest in Shopping Center and no other property of Landlord shall be subject to any such claim, demand or cause of action.

King, who was named as party to the suit as the general partner of the Parkside limited partnership, contends he should have been dismissed because the exculpatory clause limits any recovery to the limited partnership's interest in the shopping center. Aside from the fact that a general partner is liable for the payment of all debts and obligations of the limited partnership (*Prodigy Centers/Atlanta v. T-C Assoc.*, 269 Ga. 522-523, n. 1 (501 SE2d 209) (1998)), we find no error in the trial court's refusal to dismiss King because the exculpatory clause fails to satisfy the requirement that it appear prominently in the lease agreement. *Imaging Systems Intl. v. Magnetic Resonance Plus*, 227 Ga. App. 641, 644-645 (490 SE2d 124) (1997).

Because exculpatory clauses waive substantial rights, could amount to an accord and satisfaction of future claims and require a meeting of the minds on the subject matter, they must be " 'explicit, prominent, clear and unambiguous.' " *Dept. of Transp. v. Arapaho Constr.*, 180 Ga. App. 341, 343 (1) (349 SE2d 196) (1986). The exculpatory clause at issue appears in paragraph 22.8 of the lease, which has no separate paragraph heading and has typeface the same size as all of the surrounding numbered paragraphs from 22.1 through 22.14 that all appear on the last page of the form lease under the general heading of "Miscellaneous." In fact, as set forth above, the exculpatory clause is not even set off in a separate paragraph, but appears only as the second clause of a sentence in paragraph 22.8.

Lacking any indicia of prominence, the exculpatory clause is unenforceable. Compare *Imaging Systems*, 227 Ga. App. at 645; *Grace v. Golden*, 206 Ga. App. 416, 417 (425 SE2d 363) (1992). The trial court did not err by refusing to dismiss King pursuant to the exculpatory clause.

3. Parkside and King argue that Chicagoland was in default under the lease and therefore could not rely on the covenant restricting competition, which stated that it was effective only if the tenant is not in default.

Parkside points out that on November 2, 1993, when Chicagoland was one day late on the November rent payment under the lease terms, it notified Chicagoland that it was late and would be declared in default under the terms of § 17.3 (e) of the lease if it did not pay the rent due within three days of receiving the notice. The lease provided that notices be given at Chicagoland's business premises in Atlanta or at the Chicagoland offices in Chicago. This notice was addressed to Chicagoland's president, Les Silver, and hand-delivered on November 2 to the Atlanta business premises, even though Silver's office was in Chicago. After Silver received the notice in Chicago on November 5, Chicagoland attempted to hand-deliver the November rent to Parkside on the evening of November 5 within the three-day period. Nevertheless, Parkside contends Chicagoland was in default because the attempted payment on November 5 came after more than seventy-two hours (three days) had passed from the time the notice was hand-delivered to Chicagoland on November 2.

We need not decide whether Chicagoland paid the November rent within three days after the hand-delivered notice. Other evidence shows that, over the course of the lease, Parkside accepted repeated late payments from Chicagoland, up to ten days past the due date. This created a factual issue as to whether a mutual departure from the payment terms of the lease created a quasi-new agreement to accept late rent payments under OCGA § 13-4-4. *Ford v. Rollins Protective Svcs.*, 171 Ga. App. 882, 884-885 (322 SE2d 62) (1984). If there was a quasi-new agreement for late payment, then the payment terms of the lease were suspended, and Parkside could not require timely payment under the exact terms of § 17.3 of the lease until it first gave Chicagoland reasonable notice that it intended to rely on the lease terms. Id.

On these facts, the trial court properly allowed the jury to decide whether Chicagoland was in default under the lease terms or timely paid the rent under a quasi-new agreement adopted by the parties. There was no error in the trial court's refusal to grant a directed verdict or a judgment notwithstanding the verdict on this ground.

4. Parkside and King claim the trial court should have directed a

verdict in their favor because of lack of evidence establishing the measure of damages to Chicagoland's leasehold.

> The measure of damages recoverable for a lessor's breach of covenant not to rent other stipulated premises for a competing business is the difference in value between the tenant's leasehold with the covenant against competition unbroken and the same leasehold with the covenant broken. The value of said leasehold is not controlled by the stipulated rental therefor, nor the profits which the tenant could have realized from the operation of his business without the adjacent competing business. However, allegations and evidence of loss of profits are material to show the damage sustained by the lessee, in accordance with the rule herein stated. Evidence of loss of profits is admissible and pleadings in support thereof proper in order that the jury may properly estimate the value of the leasehold estate before and after the covenant is broken. Therefore, a recovery for loss of profits occasioned by a breach of contract where properly pleaded and proved may be indirectly had.

(Citations and punctuation omitted.) *David Enterprises v. Kingston Atlanta Partners*, 211 Ga. App. 108, 111 (2) (438 SE2d 90) (1993). Chicagoland produced evidence that its lease had zero value with the covenant restricting competition broken by the lease to Q-Lanta. There was also evidence that the stipulated rental payment in the lease was $52,668 per year, and that at the time the covenant was broken, the lease had two years remaining in its original term and two five-year renewal options, for a total of twelve remaining years. The jury was not, however, limited to concluding that the total damage to the value of the leasehold was $52,668 times the 12 remaining years of the lease. *Carusos v. Briarcliff, Inc.*, 76 Ga. App. 346, 351-352 (45 SE2d 802) (1947). There was further evidence from which the jury could have determined that, at the time of the lease to Q-Lanta, Chicagoland was averaging over $40,000 per year in profits from 1990 through 1992, and that these profits were lost and replaced by operating losses until the business was forced to close in February 1997. Furthermore, there was evidence that Chicagoland invested in excess of $500,000 in the business, but could obtain only $71,000 when it liquidated the business upon closing. Although Chicagoland was not entitled to recover directly for lost profits and investments, this evidence was admissible for the purpose of allowing the jury to conclude that the value of the leasehold for the purpose it was being used was substantially in excess of the stipulated rental payments in the lease. Id. The evidence was sufficient to

allow the jury to conclude that the difference between the value of the leasehold with the covenant broken and unbroken over the full term of the lease was $787,400. The trial court did not err by refusing to direct a verdict for lack of evidence establishing damages.

5. There is no merit to the contention that Chicagoland was not entitled to show evidence of lost profits after it closed its business and vacated the premises in February 1997.

Chicagoland presented sufficient evidence of established profits prior to the broken covenant so that, in determining damages to the value of the leasehold, it was not unreasonable or speculative to allow the jury to consider what profits would have been with the covenant unbroken over the term of the lease. See *Witty v. McNeal Agency*, 239 Ga. App. 554, 562 (521 SE2d 619) (1999). Moreover, there was evidence that Parkside's breach of the covenant restricting competition prevented Chicagoland from operating its business for the full term of the lease. Accordingly, the jury was entitled to conclude that Parkside was estopped from asserting as a defense that Chicagoland failed to operate for the full term of the lease. See *Merritt v. State Farm &c. Ins. Co.*, 247 Ga. App. 442, 447 (544 SE2d 180) (2000).

6. Contrary to the claim of Parkside and King, the trial court did not err in refusing to give their request to charge no. 20 relating to the award of attorney fees under OCGA § 13-6-11. The charge was untimely submitted at the close of evidence on the last day of the trial on a point that was anticipated by the parties in the pre-trial order. Accordingly, under Uniform Superior Court Rule 10.3, the trial court did not err in refusing to give the charge. *Smith v. State*, 222 Ga. App. 366, 370-371 (474 SE2d 272) (1996).

7. Parkside and King claim the evidence did not support the amount of attorney fees awarded. The trial court reduced the jury's award of attorney fees to eliminate amounts expended by Chicagoland in its unsuccessful pursuit of injunctive relief. However, in addition to those sums, Chicagoland produced evidence that it also incurred fees and expenses in the amount of $71,811.37 on its subsequent claim, plus additional fees for legal representation during the five-day trial at rates up to $150 per hour. This evidence supported the award (as reduced by the trial court) of $74,000 in fees and expenses.

8. Parkside and King contend the trial court should have set off from the jury verdict the sum of $11,503 which Chicagoland received as a settlement from the new owner of the shopping center when it closed its business in February 1997 and settled claims against the new owner. Instead, the judge instructed the jury to consider the set-off issue.

Although the settlement should have been set off from the ver-

dict by the judge (*Allison v. Patel*, 211 Ga. App. 376, 383 (438 SE2d 920) (1993)), Parkside and King presented evidence to the jury on this issue and requested that the trial court instruct the jury to decide the issue. Because any error was self-induced, Parkside and King cannot complain on appeal about the procedure they requested. *Kodadek v. Lieberman*, 247 Ga. App. 606, 608, n. 3 (545 SE2d 25) (2001).

## Case No. A01A0757

9. Contrary to Chicagoland's contention, the trial court properly directed a verdict against the claim that Parkside and King tortiously interfered with Chicagoland's lease rights.

"In order to be liable for interference with a contract, a defendant must be both a stranger to the contract and the business relationship giving rise to and underpinning the contract." *Pruitt Corp. v. Strahley*, 270 Ga. 430 (510 SE2d 821) (1999). Since neither Parkside nor King was a stranger to the lease agreement with Chicagoland, they cannot be liable for tortiously interfering with Chicagoland's lease rights.

10. The trial court did nor err in reducing the attorney fees awarded by eliminating the sums expended by Chicagoland in its effort to obtain an injunction to prohibit the lease to Q-Lanta. Since the equitable injunctive relief sought was denied, Chicagoland was not entitled to attorney fees under OCGA § 13-6-11 related to this effort. *Hunter v. George*, 265 Ga. 573, 575-576 (458 SE2d 830) (1995).

*Judgments affirmed. Johnson, P. J., Smith, P. J., and Ruffin, J., concur. Eldridge, Miller and Phipps, JJ., concur in part and dissent in part. Ellington, J., disqualified.*

MILLER, Judge, concurring in part and dissenting in part.

I concur in the majority's opinion and affirmance in Case No. A01A0757, but I respectfully dissent as to the opinion and affirmance in Case No. A01A0461, in which I would reverse the judgment. I would hold that the language of the restrictive covenant is not ambiguous, and that under its plain meaning the covenant against amusement centers protects more than Chicagoland's business interests as an arcade center and thus is unenforceably overbroad.

Parkside and King argue that the court erred in instructing and allowing the jury to construe the restrictive covenant and in failing to declare the covenant unenforceable as a matter of law. I agree that the court should have construed the covenant, and I would hold that this error was harmful in that a proper construction of the contract would have resulted in the conclusion that the covenant was unenforceable.

"The construction of a contract is a question of law for the court."[2] Contract construction follows three steps: "The trial court must first decide whether the contract language is ambiguous; if it is ambiguous, the trial court must then apply the applicable rules of construction; if after doing so the trial court determines that an ambiguity still remains, the jury must then resolve the ambiguity."[3] Thus, the jury does not become involved in the process, even if the contract is difficult to construe, until there appears an ambiguity in the contract which cannot be resolved by the court's application of the rules of construction set forth in part in OCGA § 13-2-2.[4]

I would hold that the contract provision here was not ambiguous but was plain on its face. Thus, the rules of construction need not be applied, and the matter should not have gone to the jury. The lease's restrictive covenant prohibits Parkside from entering a lease with someone who would use the space as an amusement center or other usage substantially similar to Chicagoland's use. "Amusement center" is a broad term that would include movie theaters, bowling alleys, billiards rooms, or other forms of amusement or entertainment. Nothing modifies "amusement center" so as to restrict its meaning to arcade or videogame centers.

The query would then become whether such a restriction is enforceable under Georgia law. The validity of covenants restricting the activities of lessors in commercial leases

is subject to the overriding requirements that, as to territoriality and/or duration, they be reasonably necessary to protect the interests of the covenantee, that they not impose greater restrictions upon the covenantor than are necessary for the covenantee's protection, and that they not unduly prejudice the interests of the public.[5]

Chicagoland did not narrowly define "amusement center" to restrict competition for its protection. Since the term includes activities not in competition with Chicagoland, it is overbroad and unreasonable as to the scope of the activity prohibited, i.e., it imposes greater restrictions upon Parkside than necessary to protect Chicagoland's interests. Thus, I would hold that the court erred in not striking the provision as unenforceable and in not entering judgment in

---

[2] OCGA § 13-2-1.

[3] (Footnote omitted.) *Garrett v. Women's Health Care &c.*, 243 Ga. App. 53, 56-57 (3) (532 SE2d 164) (2000); accord *Travelers Ins. Co. v. Blakey*, 180 Ga. App. 520 (349 SE2d 474) (1986).

[4] *Kusuma v. Metametrix*, 191 Ga. App. 255, 256 (2) (381 SE2d 322) (1989).

[5] (Citations omitted.) *Webster v. Star Distrib. Co.*, 241 Ga. 270, 272 (a) (244 SE2d 826) (1978).

favor of Parkside and King on the breach of contract claim and on the derivative claim for attorney fees.

I am authorized to state that Judge Eldridge and Judge Phipps join in this dissent.

DECIDED JULY 16, 2001 — 

*Browning & Tanksley, Thomas J. Browning,* for appellants.
*Wimberly & Lawson, Paul Oliver, Rhonda L. Klein,* for appellee.