# WHOLE COURT

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**July 16, 2013**

# In the Court of Appeals of Georgia

A13A0090, A13A0091. MONITRONICS INTERNATIONAL, INC.
v. VEASLEY; and vice versa.

DILLARD, Judge.

Velma Veasley was sexually assaulted by an intruder, who broke into her home earlier in the day while she was at work and remained there despite triggering her home's security-system alarm numerous times. Veasley sued Monitronics International, Inc. ("Monitronics"), the company she paid to monitor her security system, alleging that she suffered harm as a result of its negligence. Following a jury verdict and judgment in Veasley's favor, Monitronics moved for judgment notwithstanding the verdict (j.n.o.v.), to enforce a contractual limitation-of-liability clause, and alternatively, for a new trial, all of which the trial court denied.

In Case No. A13A0090, Monitronics appeals the denial of its motions for j.n.o.v., to enforce the limitation-of-liability clause, and new trial, arguing that the trial court erred in (1) finding that genuine issues of material fact precluded j.n.o.v. on Veasley's extra-contractual negligence claim; (2) holding that the limitation-of-liability clause in Monitronics's contract with Veasley was unenforceable; (3) striking its notices of apportionment; (4) failing to instruct the jury on assumption of the risk; and (5) instructing the jury that Monitronics had a duty to comply with industry standards. In Case No. A13A0091, Veasley argues that if this Court holds that Monitronics is entitled to a new trial, it should further hold that the trial court erred in finding that Monitronics could not be liable for negligently performing its contractual duties. For the reasons set forth *infra*, we affirm the jury's verdict and the trial court's judgment. Accordingly, we dismiss Veasley's cross-appeal as moot.

Construed in favor of the jury's verdict,[1] the evidence shows that in October 1998, not long after she purchased her Stone Mountain home, Velma Veasley also purchased a home security system from Tel-Star Alarms, Inc. ("Tel-Star"). Pursuant to the purchase contract, Tel-Star installed the system, which included an alarm, several door sensors, and an internal motion sensor, and assumed responsibility for

_____

[1] *See Horton v. Hendrix*, 291 Ga. App. 416, 416 (662 SE2d 227) (2008).

2

monitoring the system. To facilitate Tel-Star's monitoring of the system, Veasley provided the company with her work phone number (including her personal extension), and designated her older sister, Barbara Warren, as her emergency contact by providing her sister's phone number as well. In addition, the contract contained a clause that purported to limit Tel-Star's liability to $250 for any loss resulting from its performance of the contract. And less than one month after Veasley purchased the home-security system, Tel-Star assigned the contract to Monitronics, which then assumed responsibility for monitoring the system.

On March 29, 2006, Veasley left her home shortly after 4:00 a.m. and traveled to her job at a Target department store. At 10:27 a.m., the alarm for Veasley's home-security system sounded after an internal motion sensor was triggered. Upon receiving the alert at its monitoring site in Texas, a Monitronics representative called Veasley's home and dispatched police when the home phone was not answered. A few minutes later, the representative attempted to contact Veasley by calling her work number. But when the representative's call was answered by an automated message directing the caller to dial an extension number or press one to speak with an operator, the representative—despite having Veasley's extension number—terminated the call. Instead, the representative called Veasley's sister

3

(Warren) to inform her about the alarm, but was not immediately successful in reaching her.

In the meantime, alarms for Veasley's security system continued to sound. Specifically, at 10:41 a.m., an internal motion sensor was again triggered, and two minutes later, an alert indicated that the door leading into the home's attached garage had been opened. At 11:27 a.m., an internal motion sensor was triggered for a third time, and approximately five minutes later, the door leading into the garage was again opened. Following these two alarms, a Monitronics representative called Veasley's work number but again ended the call upon reaching Target's automated-message system. The representative then attempted to call Veasley's sister again but only reached her answering machine.

At 11:46 a.m., an internal motion sensor was triggered for a fourth time, and the Monitronics representative called the police again to inform them of the multiple alerts. Nearly 30 minutes later, the representative finally successfully contacted Veasley's sister, who stated that she could meet the police at Veasley's home and would arrive there within 20 minutes. Nevertheless, at 1:06 p.m., an internal motion sensor was triggered for yet a fifth time. Once again, the Monitronics representative called Veasley's work number but did not call her extension and thus did not reach

4

her. In fact, by this point, Veasley had left Target to go to her second job at a daycare center. The representative then attempted, once again, to contact Veasley's sister and spoke to the sister's husband, who told the representative that his wife had not yet returned. A short time later, the police contacted Monitronics and informed the representative that they would not respond to further dispatches to Veasley's house unless a key-holder was on the scene to meet them. But for the rest of the afternoon, no additional alarms were triggered; and despite the fact that it never determined the actual cause of the alarms, Monitronics made no further attempts to contact Veasley, her sister, or the police.

Veasley returned home from work at approximately 7:25 p.m. And while her sister had left a note about the alarms near the entrance to the garage, Veasley did not see it and, thus, was not aware that the alarm for her security system had been triggered multiple times throughout the day. Instead, she parked in her garage, exited the vehicle, and then started to open the internal door leading inside the house when the alarm sounded.

As she went inside and turned off the alarm, a Monitronics representative called her home telephone. Veasley told the representative that she was fine but that she did not understand why the alarm had triggered. And despite the fact that the

representative had access to the information indicating that Veasley's security system had alerted multiple times throughout the day, the representative told Veasley that the alarm most likely sounded because the door she entered did not have a delay timer. Veasley did not believe that the representative was correct about the delay timer, but she nevertheless accepted her explanation and remained in her home.

Thereafter, Veasley went to her bedroom where she noticed that the bed looked as if someone had disturbed it. She also noticed a tequila bottle and a cell phone that she did not recognize next to her bed. And feeling that things were not quite right in her home, Veasley called her sister and left a message on her answering machine about the alarm (along with a request that she return the call). Nevertheless, over the course of the next 20 minutes or so, Veasley finished some paperwork, took a shower, and ate a quick meal. Subsequently, she returned to her bathroom to get ready for bed, at which point she was grabbed by a stranger brandishing a knife. As Veasley screamed, the assailant—later identified as Stephen Okrah—dragged her to the living room, told her to shut up, and demanded money. And when Veasley told him that she did not have any cash in the home, Okrah forced her into her car and drove to several ATMs in an attempt to withdraw money from Veasley's bank account. Then, for several terrifying hours, Okrah drove around in Veasley's car while threatening her

life. Ultimately, he drove back to Veasley's house, forced her into her bedroom, and raped her.

Not long thereafter, Okrah passed out due to the fact that he had apparently been drinking alcohol throughout the day. Consequently, Veasley escaped from her home, ran to her neighbors' house, and had her neighbors call the police, who arrived quickly and arrested Okrah without further incident. Okrah eventually pleaded guilty to numerous offenses, including rape, and is currently incarcerated.

On August 18, 2009, Veasley filed suit against Monitronics alleging, *inter alia*, breach of contract, negligence, and fraudulent misrepresentation. Monitronics filed an answer, and discovery ensued. In July 2011, after discovery had closed, Monitronics filed notices stating that it would seek to apportion fault to non-parties Okrah and Warren (Veasley's sister). But after the trial court set the trial for November 7, 2011, Veasley successfully argued that Monitronics's notices of apportionment were untimely, and the trial court struck them.

In the interim, on July 20, 2011, Monitronics filed a motion for summary judgment, arguing that it owed no duty to Veasley beyond the terms of the contract between the parties; that its actions were not the proximate cause of her injuries; and that the terms of the contract limited its liability to $250. Veasley filed a response to

Monitronics's motion, but before doing so, she filed an amended complaint, which no longer contained a breach-of-contract claim. And following a hearing on the matter, the trial court denied Monitronics's summary-judgment motion, finding that genuine issues of material fact remained as to whether Monitronics breached a duty of care owed to Veasley and caused her injuries. The trial court further held that the limitation of liability in the home security purchase contract was not applicable because Veasley was suing on a tort theory and because genuine issues of material fact remained as to whether Monitronics was grossly negligent, which would also preclude the applicability of any such clause. One week later, Monitronics filed a motion requesting that the trial court reconsider its denial of summary judgment on the issue of the enforceability of the limitation-of-liability clause. And finding that its previous order was confusing, the trial court vacated it. But in its new order, the court reiterated the denial of Monitronics's motion for summary judgment, holding that the limitation-of-liability clause was "unconscionable and void as against public policy."

The case then proceeded to trial, and on the first day, the trial court responded to an issue discussed in the parties' motions in limine by ruling that the focus of the trial would be as to whether Monitronics breached extra-contractual duties it owed

to Veasley, which it undertook when its representative spoke to her on the telephone approximately 20 minutes before Okrah attacked her, and when it sought to comply with home-security industry standards. The court further ruled that whether Monitronics negligently performed its obligations under the purchase contract was not an issue for trial.

During the trial, Veasley testified about returning home from work and being held and attacked by Okrah. In addition, her expert witness discussed Monitronics's handling of the multiple alarms on the day in question and opined that it had not complied with industry standards. And after Veasley concluded presenting her evidence, Monitronics moved for a directed verdict on grounds similar to those argued in its motion for summary judgment. The trial court denied the motion, and Monitronics then presented its case.

At the conclusion of the trial, the jury found in favor of Veasley. Specifically, pursuant to a special verdict form, the jury found that Monitronics did not exercise ordinary care, increased the danger to Veasley, and failed to comply with industry standards. The jury then apportioned 96 percent of the fault to Monitronics and 4 percent of the fault to Veasley, awarding Veasley $9,000,000 in damages. But the jury further found that Monitronics's actions were not grossly negligent, that its conduct

was not willful or wanton, and therefore, that punitive damages were not warranted. Shortly thereafter, the trial court issued a judgment in favor of Veasley but slightly reduced her damages to $8,640,000 based on the jury's finding that she was 4 percent at fault.

Subsequently, Monitronics filed a motion for j.n.o.v., a motion to enforce the limitation-of-liability clause in light of the jury's finding that Monitronics was not grossly negligent, and alternatively, a motion for a new trial. The trial court held a hearing on these issues, after which it denied all three motions. These consolidated appeals follow.

1. Monitronics first contends that the trial court erred in finding that genuine issues of material fact precluded j.n.o.v. on Veasley's extra-contractual negligence claim. Specifically, Monitronics argues that it owed no duty of care to Veasley, that she did not rely on any misstatements by Monitronics, and that its conduct was not the proximate cause of her harm. We disagree.

It is well established that on appeal from the denial of a motion for a directed verdict or for j.n.o.v., we construe the evidence "in the light most favorable to the party opposing the motion, and the standard of review is whether there is any

evidence to support the jury's verdict."[2] Indeed, because the jurors are "the sole and exclusive judges of the weight and credit given the evidence," we must construe the evidence with "every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict."[3] We do, however, review questions of law *de novo*.[4] With these guiding principles in mind, we turn now to Monitronics's specific claim that the trial court erred in allowing this case to be decided by the jury.

Monitronics contends that it owed Veasley no duty of care beyond the terms of the home-security-system purchase contract, that its conduct was not relied upon by Veasley, and that it did not increase her risk of harm.[5] But under well-established

---

[2] *Park v. Nichols*, 307 Ga. App. 841, 845 (2) (706 SE2d 698) (2011) (punctuation omitted).

[3] *Wood v. B & S Enterprises, Inc.*, 314 Ga. App. 128, 135 (5) (723 SE2d 443) (2012) (footnote and punctuation omitted).

[4] *Eason v. Dozier*, 298 Ga. App. 65, 65 (679 SE2d 89) (2009).

[5] As previously noted, just prior to the start of trial, the trial court ruled that whether Monitronics negligently performed its obligations under the home-security-system purchase contract was not an issue to be decided at trial. This ruling is the subject of Veasley's conditional cross-appeal, which we need not address given the fact that we affirm the jury's verdict. Nevertheless, it is axiomatic that "a single act or course of conduct may constitute not only a breach of contract but an independent tort as well, if in addition to violating a contract obligation it also violates a duty

11

Georgia law, "a person may be held liable for the negligent performance of a voluntary undertaking."[6] Specifically,

> one who undertakes to do an act or perform a service for another has the duty to exercise care, and is liable for injury resulting from his failure to do so, even though his undertaking is purely voluntary or even though it was completely gratuitous, and he was not under any obligation to do such act or perform such service, or there was no consideration for the promise or undertaking sufficient to support an action ex contractu based thereon.[7]

And whether such a relationship exists between the parties "such as that which would authorize the finding of an independent harm is a question of fact to be resolved by a jury."[8]

---

owed to plaintiff independent of contract to avoid harming him." *Orkin Exterminating Co. v. Stevens*, 130 Ga. App. 363, 365 (6) (203 SE2d 587) (1973); *see Brookview Holdings LLC v. Suarez*, 285 Ga. App. 90, 93-94 (1) (645 SE2d 559) (2007) (holding that genuine issues of material fact remained as to whether defendant was negligent and thus breached a duty arising out of contract with plaintiff to provide security).

[6] *Osowski v. Smith*, 262 Ga. App. 538, 540 (1) (586 SE2d 71) (2003).

[7] *Id.* at 540 (1) (punctuation omitted); *see also* Restatement (Second) of Torts § 323 (1965).

[8] *Lenny's, Inc. v. Allied Sign Erectors, Inc.*, 170 Ga. App. 706, 709 (3) (318 SE2d 140) (1984).

Here, there was some evidence to support the jury's finding that Monitronics owed Veasley an extra-contractual duty of care that it breached when its representative spoke to Veasley on the telephone—after she returned home and the final alarm sounded—and (1) provided her with misinformation regarding why the final alarm sounded and (2) failed to inform her that the security-system alarm had been triggered multiple times throughout the day. Furthermore, although Veasley testified that she did not think the Monitronics representative was correct when the representative told her that the alarm sounded because the door she entered did not have a delay timer, she also testified that she nevertheless felt safe due to (1) the reassurances given to her during that conversation and (2) the fact that she had an alarm system. And such conflicts in the evidence were for the jury to resolve, which it did in Veasley's favor.[9] Additionally, Veasley testified that she would not have remained in her home if she had been informed of the multiple alarms that had alerted throughout the day without resolution. Thus, there was some evidence that Veasley not only relied upon Monitronics's misstatements but that those misstatements and Monitronics's failure to provide her with full information about the alarms increased

[9] *See Wood*, 314 Ga. App. at 135 (5) (holding that weighing credibility is the province of the jury, and the evidence must be construed to uphold the jury's verdict even when the evidence is in conflict).

13

her risk of harm. Accordingly, the trial court did not err in denying Monitronics's motion for j.n.o.v. as to its claims that it owed no extra-contractual duty to Veasley.[10]

Monitronics further asserts that as a matter of law its conduct was not the proximate cause of Veasley's harm. However,

> questions of negligence and diligence and of cause and proximate cause and whose negligence constituted the proximate cause of the plaintiff's injuries are, except in plain, palpable and indisputable cases, solely for the jury, and the courts will decline to decide such questions unless reasonable minds cannot differ as to the conclusions to be reached.[11]

---

[10] *See Osowski*, 262 Ga. App. at 540-41 (1) (reversing because there was a genuine issue of material fact as to whether property owner agreed to undertake duty of ensuring that dogs on property would not pose a risk of harm to plaintiff as he installed cable, precluding summary judgment for property owner on negligence claim asserted by plaintiff in connection with alleged attack by dog); *see also Boyce v. Gregory Poole Equip. Co.*, 269 Ga. App. 891 896-97 (1) (c) (605 SE2d 384) (2004) (reversing summary judgment on the ground that seller of product who made investigations into product's expected use assumed a duty of ordinary care to warn users of patent defect in product and whether seller breached that duty was a question for the jury); *Compare Abundant Animal Care, LLC v. Gray*, 316 Ga. App. 193, 196-97 (2) (728 SE2d 822) (2012) (holding that plaintiff could not assert a claim of negligent performance of a voluntary undertaking when she failed to show that she was even aware of defendant's voluntary undertaking); *Griffin v. AAA Auto Club S., Inc.*, 221 Ga. App. 1, 3 (2) (470 SE2d 474) (1996) (affirming grant of summary judgment to employer when employee did not show that she relied on employer's security measures to protect her from attack by boyfriend).

[11] *Hayes v. Crawford*, 317 Ga. App. 75, 79 (730 SE2d 26) (2012) (punctuation omitted); *see Zwiren v. Thompson*, 276 Ga. 498, 500 (578 SE2d 862) (2003) ("What amounts to proximate cause is undeniably a jury question . . . ." (punctuation

14

And here, given the evidence that Veasley would not have remained in her home if she had been fully informed of the multiple alarms that had been triggered throughout the day, there was some evidence that Monitronics's conduct was the proximate cause of her harm.[12] Accordingly, the trial court did not err in submitting this issue to the jury.

2. Monitronics also contends that the trial court erred in holding that the limitation-of-liability clause included in the home-security-system purchase contract between Tel-Star and Veasley—which was assigned to Monitronics—was unenforceable. Again, we disagree.

In considering this argument, we begin by noting that an issue of contract construction is usually a question of law for the court to resolve and, as such, it is subject to *de novo* review.[13] This review is guided by three fundamental principles of

omitted)).

[12] *See Hayes*, 317 Ga. App. at 79 (reversing summary judgment because genuine issue of material fact existed as to whether driver of lead truck was a proximate cause of fatal collision); *Vann v. Finley*, 313 Ga. App. 153, 162-63 (2) (721 SE2d 156) (2011) (reversing summary judgment because genuine issue of material fact existed as to whether electrical inspector's failure to check mobile home for smoke detectors was a proximate cause of children's death in a later fire).

[13] *Mon Ami Int'l, Inc. v. Gale*, 264 Ga. App. 739, 740-41 (592 SE2d 83) (2003).

contract construction: (1) If the agreement is unambiguous, "the court will look to the contract alone to find the intention of the parties";[14] (2) the existence or nonexistence of an ambiguity is a question of law for the court;[15] and (3) the issue of interpretation becomes a jury question only when there appears to be "an ambiguity in the contract which cannot be negated by the court's application of the statutory rules of construction."[16]

And here, the relevant section of the home-security-system purchase contract, which was printed on the back of the one-page document along with the rest of the terms, read as follows:

> 5. DAMAGES - Subscriber acknowledges that it is impracticable and extremely difficult to fix the actual damages, if any that might proximately result to Subscriber from either Tel-Star's failure to perform any of the obligations under this agreement or the failure of the System to properly operate because of among other things . . .
>
> (e) the police or fire department or other organization to which the connection may be made or an alarm signal may be transmitted may invoke the provisions hereof against any claims by the Subscriber or by

---

[14] *Id.* at 741 (punctuation omitted).

[15] *Id.* (punctuation omitted).

[16] *Id.* (punctuation omitted).

16

others due to any failure of such organization. Subscriber therefore agrees that if Tel-Star should be found liable for loss or damages caused by a failure of Tel-Star's to perform any of its obligations under this agreement (including but not limited to installation, maintenance, monitoring or service or the failure of the System or equipment in any respect whatsoever), Tel-Star's total liability shall be limited to $250.00. This liability shall be exclusive, and the provisions of this section shall apply to any loss or damage, regardless of cause, which results directly and indirectly from Tel-Star's performance or non-performance of the obligations imposed under this Agreement or under law from any negligence of the part of Tel-Star, its agents, employees or assigns. EXCEPT FOR DAMAGES DESCRIBED IN THIS SECTION, TEL-STAR SHALL NOT BE LIABLE TO PURCHASER FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES. Some states do not allow the exclusion or limitation of incidental or consequential damages, so the above limitation or exclusion may not apply to you.

As previously noted, in its denial of Monitronics's motion for summary judgment, the trial court held that the limitation-of-liability clause was unconscionable and void as against public policy, and it reaffirmed this ruling in its denial of Monitronics's motions for j.n.o.v. and other post-trial relief. But setting aside whether the trial court was correct in ruling that this limitation-of-liability clause was unconscionable, we nevertheless agree with the court's ultimate conclusion that the clause was unenforceable, and a summary judgment ruling that

17

is right for any reason—particularly a ruling that involves construction of a contract—must be affirmed.[17]

At the outset, we note that Georgia's appellate courts are required to construe agreements in a manner that respects the parties' sacrosanct freedom of contract.[18] Indeed, it is well settled that contracts will not be avoided by the courts on the grounds that they violate public policy, "except where the case is free from doubt and where an injury to the public interest clearly appears."[19] It is also well settled that exculpatory clauses in which a business seeks to relieve itself from its own negligence are valid and binding in this State, "and are not void as against public policy unless they purport to relieve liability for acts of gross negligence or wilful or

---

[17] *See Board of Comm'rs of Crisp County v. City Comm'rs of the City of Cordele*, 315 Ga. App. 696, 700 (727 SE2d 524) (2012) ("[w]e . . . affirm the court's judgment, even though we interpret the contract somewhat differently from the trial court."); *Caswell v. Anderson*, 241 Ga. App. 703, 706 (527 SE2d 582) (2000) (affirming trial court's grant of summary judgment as right for any reason given that trial court's ultimate construction of contract was correct).

[18] *See Colonial Properties Realty Ltd. Partnership v. Lowder Const. Co., Inc.*, 256 Ga. App. 106, 111-112 (567 SE2d 389) (2002); *Duncan v. Integon General Ins. Corp.*, 267 Ga. 646, 650 (482 SE2d 325) (1997) ("Georgia has historically afforded great protection to the freedom to contract with another person. Georgia courts are thus bound to enforce contracts as made so long as they are not contrary to law or public policy.").

[19] *See Colonial Properties*, 256 Ga. App. at 111-112.

wanton conduct."[20] Nevertheless, because exculpatory clauses may amount to "an accord and satisfaction of future claims and waive substantial rights, they require a meeting of the minds on the subject matter and must be explicit, prominent, clear and unambiguous."[21] Moreover, any ambiguities in exculpatory clauses are "construed against the drafters."[22]

Here, the limitation-of-liability clause is found on the back of the one-page, two-sided contract in subsection (e) of paragraph 5, which is titled "DAMAGES." And rather than being set off in its own paragraph—or even its own

---

[20] *Holmes v. Clear Channel Outdoor, Inc.*, 284 Ga. App. 474, 477 (2) (644 SE2d 311) (2007). We take a moment here to note that although the section of the contract at issue is more accurately characterized as a limitation-of-liability clause rather than an exculpatory clause, the parties have not argued that we should review the enforceability of such clauses differently, and Georgia case law does not appear to treat such clauses differently for purposes of review. *See, e.g.*, *Lanier at McEver, L.P. v. Planners & Eng'rs Collaborative, Inc.*, 284 Ga. 204, 205-06 (1) (663 SE2d 240) (2008) (holding a limitation-of-liability clause unenforceable on the grounds that it violates public policy); *RSN Properties, Inc. v. Eng'g Consulting Servs., Ltd.*, 301 Ga. App. 52, 54-55 (686 SE2d 853) (2009) (holding that a limitation-of-liability clause did not violate public policy).

[21] *Holmes*, 284 Ga. App. at 477 (2) (punctuation omitted); *see Parkside Ctr., Ltd. v. Chicagoland Vending, Inc.*, 250 Ga. App. 607, 611 (2) (552 SE2d 557) (2001) (holding that exculpatory clauses must be "explicit, prominent, clear and unambiguous" (punctuation omitted)).

[22] *Holmes*, 284 Ga. App. at 477 (2).

subparagraph—the $250 limitation appears toward the end of the second, long sentence in subsection (e), after a nearly equally long sentence discussing the liability of police or fire departments, and it is far removed from the paragraph 5 title that indicates the subject matter of the paragraph. In addition, while the sentence indicating that Monitronics is not liable for incidental or consequential damages is in capitalized typeface, neither the $250 limitation nor the fact that it applies to acts of negligence is capitalized or set off in any unique or prominent way. To the contrary, this important language is written in the same small, single-spaced typeface as the majority of the contract. Given these circumstances, we conclude that the limitation-of-liability clause in the home-security-system purchase contract cannot be characterized as explicit, and it certainly lacks the requisite indicia of prominence.[23]

---

[23] *See Parkside Ctr., Ltd.*, 250 Ga. App. at 611-12 (2) (holding that exculpatory clause that "has no separate paragraph heading and has typeface the same size as all of the surrounding numbered paragraphs . . . that all appear on the last page of the form lease under [a] general heading . . ." lacked indicia of prominence and, therefore, was unenforceable). *Cf. Leland Indus., Inc. v. Suntek Indus., Inc.*, 184 Ga. App. 635, 636-37 (1) (362 SE2d 441) (1987) (holding that disclaimer was not conspicuous as required by OCGA § 11-2-316 (2) given that only the introductory language was capitalized and the actual disclaimer language was in exactly the same size and color type as the remainder of the contract). *Compare Imaging Sys. Int'l, Inc. v. Magnetic Resonance Plus, Inc.*, 227 Ga. App. 641, 644-45 (1) (490 SE2d 124) (1997) (holding that exculpatory clause was enforceable when clause was set off in

20

Although not stating as much explicitly, the dissent attempts to distinguish the limitation-of-liability clause at issue here from the exculpatory clause that the dissent's author found unenforceable in *Parkside Ctr., Ltd. v. Chicagoland Vending, Inc.*[24] by claiming that the capitalized reference to "incidental or consequential damages" alone renders this clause sufficiently prominent. But while this particular part of the limitation-of-liability clause may be prominent, the rest of the long subsection (e), including the $250 limitation-of-liability and the reference to its own negligence upon which Monitronics actually relies, is not. Indeed, as previously noted and quite similar to the exculpatory clause at issue in *Parkside Ctr., Ltd.*, the limitation-of-liability clause itself was not set off in any meaningful way here.[25] Accordingly, we find that the clause is unenforceable, albeit for a reason different than that relied upon by the trial court.

---

its own paragraph with a capitalized heading and with all key language capitalized); *Grace v. Golden*, 206 Ga. App. 416, 417 (1) (b) (425 SE2d 363) (1992) (holding that exculpatory clause in security deed was enforceable when the typeface of the clause was "larger and bolder than that in the preprinted portions of the deed").

[24] 250 Ga. App. 607.

[25] *See id.* at 611-12 (2) (holding that exculpatory clause that with no separate paragraph heading, typeface the same size as all of the surrounding numbered paragraphs and that appears on the last page of the form lease under a general heading was unenforceable).

3. Monitronics next contends that the trial court erred in striking its notices of apportionment as untimely. Again, we disagree.

The apportionment-of-damages statute provides, in part, that "[n]egligence or fault of a nonparty shall be considered if the plaintiff entered into a settlement agreement with the nonparty or if a defending party gives notice not later than 120 days prior to the date of trial that a nonparty was wholly or partially at fault."[26] And the notice "shall be given by filing a pleading in the action designating the nonparty and setting forth the nonparty's name and last known address, or the best identification of the nonparty which is possible under the circumstances, together with a brief statement of the basis for believing the nonparty to be at fault."[27] Importantly, the Supreme Court of Georgia has acknowledged that the apportionment statute changes the common law, and "statutes in derogation of the common law must be limited strictly to the meaning of the language employed, and not extended beyond the plain and explicit terms of the statute."[28]

---

[26] *See* OCGA § 51-12-33 (d) (1).

[27] *See* OCGA § 51-12-33 (d) (2).

[28] *Couch v. Red Roof Inns, Inc.*, 291 Ga. 359, 364 (1) (729 SE2d 378) (2012) (punctuation omitted).

22

In this matter, discovery ended on June 30, 2011. But Monitronics waited until July 12, 2011, to file a notice that it would seek to apportion fault to Okrah and waited until July 27, 2011, to file a similar notice regarding Warren (Veasley's sister). On August 2, 2011, the court set the trial for November 7, 2011, which resulted in Monitronics's notices of apportionment being filed less than 120 days before trial and, therefore, untimely.[29] Consequently, Veasley moved to strike both notices of apportionment, and the trial court granted same.

Monitronics's argues, unsurprisingly, that its notices were not initially untimely when filed but only became so after the trial court set the trial date. While this is undoubtedly true, it is important to note that "trial courts have discretion to set their trial calendars and manage the call of cases for trial, limited by the due process requirement that notice be reasonable under the totality of the circumstances."[30] Thus, as the end of discovery approached in this matter, Monitronics should have been aware that setting the case for trial was imminent and acted accordingly.

---

[29] *See* OCGA § 51-12-33 (d) (1).

[30] *Jones, Martin, Parris & Tessener Law Offices, PLLC v. Westrex Corp.*, 310 Ga. App. 192, 194 (2) (712 SE2d 603) (2011) (punctuation omitted); *see Thornton v. Nat'l Am. Ins. Co.*, 269 Ga. 518, 518-19 (1) (499 SE2d 894) (1998).

23

Furthermore, we are not at all persuaded by Monitronics's argument that its notices of apportionment should not have been struck because it substantially complied with the statute. The statutory deadline is what it is, and the plain and unambiguous meaning of OCGA § 51-12-33 (d) (1)'s text mandates *strict* compliance—*i.e.*, "negligence or fault of a nonparty shall be considered . . . if a defending party gives notice not later than 120 days prior to the date of trial that a nonparty was wholly or partially at fault." As such, a defending party either complies with the 120-day notice requirement or it does not. And here, there is no question that Monitronics failed to comply with this statutory requirement.

What Monitronics really takes issue with is not the statutory deadline, but rather the trial court's decision to set the trial date when it did. The proper line of inquiry then is whether the trial court abused its discretion in this respect; and we conclude that it did not.

Monitronics cannot assert any credible reason for waiting until after discovery ended to file its notices of apportionment. Monitronics was well aware of Okrah's role in causing Veasley's harm from the moment she filed suit, if not sooner. Likewise, Warren was deposed on July 21, 2010, and thus whether to attribute any fault to her could have been determined nearly a year before Monitronics finally

24

attempted to do so. Indeed, the fact that Monitronics filed a notice that it would seek to apportion fault to DeKalb County law-enforcement authorities on March 4, 2010, belies any contention that it was unable to file similarly timely notices regarding Okrah and Warren. We, therefore, find that strict compliance with OCGA § 51-12-33 (d) (1) was required and that the trial court was well within its right to set the trial date when it did.[31] Accordingly, the trial court did not err in striking Monitronics's notices of apportionment.

4. Monitronics next contends that the trial court erred in denying its request to instruct the jury on the law of assumption of the risk. Once again, we disagree.

It is axiomatic that "[a] jury charge must be adjusted to the evidence, apt, and a correct statement of the applicable law."[32] And a refusal to give a requested jury charge is not error unless "the request is entirely correct and accurate; is adjusted to the pleadings, law, and evidence; and is not otherwise covered in the general

---

[31] *Cf. Swanigan v. Leroux*, 240 Ga. App. 550, 550-51 (1) (524 SE2d 244) (1999) (holding that service pursuant to nonresident-motorist statute was in derogation of the common law and, thus, required strict compliance)

[32] *Wood*, 314 Ga. App. at 130 (1) (punctuation omitted).

charge."[33] With these guiding principles in mind, we turn now to address Monitronics's contention by first discussing what "assumption of the risk" entails.

In Georgia, the affirmative defense of assumption of the risk bars a plaintiff from recovering on a negligence claim if "it is established that [she] without coercion of circumstances, chooses a course of action with full knowledge of its danger and while exercising a free choice as to whether to engage in the act or not."[34] And a defendant asserting an assumption-of-the risk defense must "establish that the plaintiff (1) had actual knowledge of the danger; (2) understood and appreciated the risks associated with such danger; and (3) voluntarily exposed [herself] to those risks."[35] Importantly, knowledge of the risk is "the watchword of assumption of risk, and means both *actual* and *subjective* knowledge on the plaintiff's part."[36] Specifically, the knowledge that a plaintiff who assumes a risk must subjectively possess is "that of the specific, particular risk of harm associated with the activity or

---

[33] *Preston v. Sabetazm*, 269 Ga. App. 451, 454 (2) (604 SE2d 224) (2004).

[34] *Vaughn v. Pleasent*, 266 Ga. 862, 864 (1) (471 SE2d 866) (1996) (punctuation omitted).

[35] *Id.*

[36] *Id.* (footnote and punctuation omitted).

26

condition that proximately causes injury."[37] And the knowledge requirement does not refer to "a plaintiff's comprehension of general, non-specific risks that might be associated with such conditions or activities."[38]

Monitronics and the dissent argue that there is circumstantial evidence that Veasley assumed the risk that resulted in her being harmed because she knew that the Monitronics representative's statement about the lack of a delay timer on the internal garage door was incorrect and saw the tequila bottle and unfamiliar cell phone in her bedroom, but chose to remain in her home. But our case law holds that a charge on assumption of the risk would have been appropriate here only if there was evidence, circumstantial or otherwise, that Veasley had *specific knowledge* that a violent intruder was inside her home but, nevertheless, chose to stay.[39] Here, there was no

---

[37] *Id.*; *see Vaughn v. Protective Ins. Co.*, 243 Ga. App. 79, 81 (2) (532 SE2d 159) (2000) ("A charge on assumption of the risk is appropriate where there is evidence that the plaintiff had subjective knowledge of the specific, particular risk of harm associated with the activity or condition that proximately causes injury, yet proceeded anyway." (punctuation omitted)).

[38] *Vaughn*, 266 Ga. at 864 (1) (punctuation omitted).

[39] *See Vaughn*, 266 Ga. at 865 (2) (holding in personal-injury action brought by police officer that evidence did not warrant an assumption-of-the risk charge because even though officer was driving on the wrong side of the road with his emergency lights flashing, there was no evidence that he saw the signal on the truck before it pulled in front of him and thus had no knowledge of the dangerous condition

27

such evidence. While Veasley acknowledged seeing the tequila bottle and cell phone in her bedroom, she also testified that it was not uncommon for her sister and her sister's husband to "come by" her house when she was not there. Indeed, it is somewhat ironic that Monitronics argues that Veasley possessed the requisite knowledge to warrant an assumption of the risk charge, yet does not dispute that its representative provided her with incorrect information about the delay timer and

that awaited him at the intersection); *Vaughn*, 243 Ga. App. at 82-83 (2) (holding that assumption-of-the-risk charge was not warranted because although plaintiff's decedent, who was riding on the back of a flatbed truck, knew that truck's brakes were faulty, and thus knew that truck may not be able to stop, he did not assume the risk of being hit by another vehicle being driven in a negligent manner); *Jimenez v. Morgan Drive Away, Inc.*, 238 Ga. App. 638, 640 (1) (519 SE2d 722) (1999) (reversing trial court's decision to charge on assumption of the risk because plaintiff's knowledge of the dangers of driving a truck on the highway when the clutch is malfunctioning and parking a disabled truck in the emergency lane was not sufficient to establish knowledge that a vehicle would come into the emergency lane and strike the truck); *Beringause v. Fogleman Truck Lines, Inc.*, 200 Ga. App. 822, 824-25 (4) (409 SE2d 524) (1991) (holding that evidence did not support assumption-of-the-risk charge when plaintiff–police officer was speeding and straddling median at the time of the collision given that there was no evidence that once truck swerved into his lane, officer made the conscious decision to proceed and risk a collision). *Compare Landings Ass'n, Inc. v. Williams*, 291 Ga. 397, 399 (728 SE2d 577) (2012) (holding that victim of fatal alligator attack was aware that wild alligators were present in the development and thus assumed the risk of walking at night in areas inhabited by such alligators); *Teems v. Bates*, 300 Ga. App. 70, 72-73 (1) (684 SE2d 662) (2009) (holding that assumption-of-the-risk instruction was warranted in case in which teenage plaintiff was injured while car-surfing given that plaintiff knew this to be an obviously dangerous activity).

failed completely to inform her about the multiple alarms that alerted throughout the day without resolution. Given these circumstances, an instruction on assumption of the risk would have been inapt, incorrect, and not reasonably raised or authorized by the evidence.[40] Thus, the trial court's denial of Monitronics's request to instruct the jury on assumption of the risk was entirely proper.

5. Monitronics further contends that the trial court committed reversible error in instructing the jury that Monitronics had a duty to comply with industry standards. Again, we disagree.

As previously noted, jury instructions "must be adjusted to the evidence, apt, and a correct statement of the applicable law."[41] In addition, the review of allegedly erroneous jury instructions is a legal question, and we therefore "owe no deference to the trial court's ruling and apply the 'plain legal error' standard of review."[42]

---

[40] *See City of Baldwin v. Woodard & Curran, Inc.*, 316 Ga. App. 768, 775-76 (6) (730 SE2d 486) (2012) (holding that it was not error for trial court to refuse to give requested charge that was not adjusted to evidence), *overruled on other grounds by City of Baldwin v. Woodard & Curran, Inc.*, ___ Ga. ___ , Slip op. (Case No. S12G1842; decided May 20, 2013).

[41] *Wood*, 314 Ga. App. at 130 (1) (punctuation omitted).

[42] *Id.* (punctuation omitted).

29

Here, during the trial, Veasley's expert testified regarding Monitronic's conduct in responding to Veasley's home-security-system alarms on the day in question and opined that some aspects of that conduct failed to comply with generally accepted standards within the home-security-system industry. Then, at the trial's conclusion, the trial court charged the jury as follows: "I further charge you that when Monitronics spoke to Ms. Veasley at 7:25 p.m. it had a duty to exercise ordinary care, a duty to act without increasing the danger or harm to her, and a duty to comply with industry standards." The special verdict form reflected this charge, asking the jury to answer separately whether Monitronics exercised ordinary care, acted without increasing the danger or harm to Veasley, and complied with industry standards.

Monitronics argues that this instruction was a misstatement of law and, therefore, constituted reversible error. In doing so, Monitronics is correct in noting that standards or recommendations published by a private entity for use as guidelines "do not create a legal requirement to comply with those standards, and violation of such privately set guidelines, although admissible as illustrative of negligence, does

not establish negligence."[43] Nevertheless, "expert testimony as to the practices of an industry [is] acceptable."[44] And furthermore,

> [t]he law imposes upon [those] *performing skilled services* the obligation to exercise a reasonable degree of care, skill, and ability, which is generally taken and considered to be such a degree of care and skill as, under similar conditions and like surrounding circumstances, is ordinarily employed by others of the same profession.[45]

Moreover, as demonstrated by the special-verdict form, the jury here found that Monitronics's conduct constituted a failure to exercise ordinary care toward Veasley and a failure to act without increasing the danger or harm to her. Thus, even if the trial court's instruction on industry standards was error, Monitronics has not shown that the charge caused any harm. Indeed, to show reversible error, "there must be harm as well as error and the lack of harm makes this enumeration of error without

---

[43] *Muller v. English*, 221 Ga. App. 672, 678 (2) (c) (472 SE2d 448) (1996) (punctuation omitted).

[44] *Thomas v. MARTA*, 300 Ga. App. 98, 103 (2) (b) (684 SE2d 83) (2009) (punctuation omitted).

[45] *Schofield Interior Contractors, Inc. v. Standard Bldg. Co.*, 293 Ga. App. 812, 814 (668 SE2d 316) (2008) (emphasis supplied) (punctuation omitted).

merit."[46] Accordingly, the trial court's decision to instruct the jury on industry standards did not amount to reversible error.

6. Finally, in Case No. A13A0091, Veasley argues that if this Court holds that Monitronics is entitled to a new trial, it should further hold that the trial court erred in finding that Monitronics could not be liable for negligently performing its contractual duties. But given that we are affirming the jury's verdict and the trial court's judgment, we need not reach the merits of Veasley's cross appeal. Accordingly, we dismiss Veasley's cross-appeal, as well as Monitronics's motion to dismiss the cross-appeal, as moot.

*Judgment affirmed in Case No. A13A0090; appeal dismissed as moot in Case No. A13A0091. Phipps, C. J. and McFadden, J., concur. Boggs and McMillian, JJ., concur fully and specially. Doyle, P. J., concurs specially. Andrews, P. J., dissents.*

---

[46] *Teems*, 300 Ga. App. at 77 (2) (punctuation omitted); *see McCorkle v. Dep't of Transp.*, 257 Ga. App. 397, 404-05 (4) (571 SE2d 160) (2002) (holding that trial court's instruction that was erroneous as a matter of law was harmless when there was substantial other evidence produced at trial to show defendant's liability); *Campbell v. Beak*, 256 Ga. App. 493, 497-98 (4) (568 SE2d 801) (2002) (holding that although trial court's charge was erroneous "the jury's verdict may stand because the evidence presented supports it under the correct standard").

A13A0090, A13A0091. MONITRONICS INTERNATIONAL, INC.
v. VEASLEY, and vice versa.

Boggs, Judge, concurring specially.

I concur fully with the majority opinion, with the exception of Division 2. I agree that the limitation of liability clause in the contract does not bar Veasley's action, but for a different reason: the clause in question can be interpreted to apply only to property damage or loss, not personal injury.

Paragraph 4, pertaining to "WARRANTY LIMITATIONS AND EXCLUSIONS," refers only to "the value of Subscriber's premises and possessions." Moreover, in paragraph 5, "DAMAGES," the first subparagraph attributes the difficulty in fixing actual damages to "the uncertain amount or value of *property* belonging to the Subscriber or others and kept on the premises which may be *lost, stolen, destroyed, damaged or otherwise affected* by Occurrences which the System or service is designed to detect or avert." (Emphasis supplied.) In this light, the

repeated references to "loss or damages" throughout paragraph 5 could appear, to a lay reader, to refer to property loss or damage only, not personal injury.

As Judge McMillian correctly notes in her special concurrence, an exculpatory clause must be clear and unambiguous and is construed against the drafter. I would therefore conclude that this language, at a minimum, creates an ambiguity as to whether this clause applies to a personal injury claim.

A13A0090. MONITRONICS INTERNATIONAL, INC. v. VEASLEY.

A13A0091. VEASLEY v. MONITRONICS INTERNATIONAL, INC.

McMILLIAN, Judge, concurring fully and specially.

I concur fully with Divisions 1, 3, 4, and 5. However, with respect to Division 2, although I agree that the limitation-of-liability clause does not bar Veasley's negligence claim, I reach that conclusion for a different reason. Thus, I concur specially in Division 2.

1. The majority concludes that the limitation-of-liability clause is unenforceable because it is not sufficiently prominent in the contract. However, the majority minimizes the significance of the language in the same paragraph providing: "EXCEPT FOR THE DAMAGES DESCRIBED IN THIS SECTION, [MONITRONICS] SHALL NOT BE LIABLE TO PURCHASER FOR ANY

INCIDENTAL OR CONSEQUENTIAL DAMAGES." Conceding that this language is prominent, the majority nevertheless finds that because the previous sentence describing the specific limitations on damages was not capitalized or bolded, it cannot be enforced. This is not the law in Georgia, nor do I believe it should be.

The majority cites no cases striking an exculpatory clause like the one in this case, which contains prominent and explicit language stating that the drafting party's liability is limited to the damages described in that section, thus alerting the contracting party that her ability to recover damages may be limited as further explained in the section as a whole. To the contrary, *Leland Industries, Inc. v. Suntek Industries, Inc.*, 184 Ga. App. 635, 636-637 (1) (362 SE2d 441) (1987),[1] upon which the majority relies, notes that the prominent introductory language in that case was only general in nature and did not relate to the warranty disclaimers, suggesting that if the introductory language had referred to the disclaimers, the clause could have satisfied OCGA § 11-2-316 (2). Moreover, even though the other cases upon which the majority relies upheld exculpatory clauses that were capitalized or in larger or

---

[1] I question whether *Leland Industries* applies to exculpatory clauses outside the warranty context as the issue in that case was whether the warranty disclaimer language complied with the specific requirements of OCGA § 11-2-316 (2), which is not at issue here.

bolder typeface or invalidated clauses that lacked "any indicia of prominence,"[2] those cases do not stand for the proposition that an exculpatory clause with indicia of prominence, but containing words that are not capitalized or bolded, is necessarily unenforceable. Rather, in my view, a limitation-of-liability clause that is not specifically capitalized or bolded may still be sufficiently prominent if other language referencing the drafter's limited liability within the same section is capitalized, bolded or otherwise made sufficiently prominent so as to draw the contracting party's attention to the language containing the limitation-of-liability clause. Therefore, I agree with Division 1 of the dissent to the extent that it finds that the limitation-of-liability clause in this case is valid and enforceable.[3]

2. However, given the peculiar procedural posture of this case and the theory of liability that went to the jury, I do not find that the limitation-of-liability clause bars Veasley's negligence claim. Before trial, the court limited Veasley's negligence claim to whether Monitronics assumed any extra-contractual duties and whether those

_____

[2] See *Parkside Center, Ltd. v. Chicagoland Vending, Inc.*, 250 Ga. App. 607, 612 (3) (552 SE2d 557) (2001) and other cases contained in footnote 23 of majority opinion.

[3] But I expressly do not agree with footnote 1 of the dissent or in Division 2 with respect to the refusal to give Monitronics' request to give the pattern jury charge on the defense of assumption of risk.

3

extra-contractual duties were breached; the court ruled that whether Monitronics

negligently performed its duties under the contract was not an issue for trial.[4]

Therefore, the question before us is whether the limitation-of-liability clause applies

to the negligence claim actually submitted to the jury.

> Under Georgia law,

> [e]xculpatory clauses must be clear and unambiguous, they must be specific in what they purport to cover, and any ambiguity will be construed against the drafter of the instrument. The reason why exculpatory clauses should be explicit, prominent, clear and unambiguous[] is that such an agreement amounts to a waiver of substantial rights, could be an accord and satisfaction of possible future claims, and requires a meeting of the minds on the subject matter.

(Citations and punctuation omitted.) *DOT v. Arapaho Constr., Inc.*, 180 Ga. App.

341, 343 (1) (349 SE2d 196) (1986), aff'd *DOT v. Arapaho Constr., Inc.*, 257 Ga. 269

(357 SE2d 593) (1987).

Here, the limitation-of-liability clause limits Monitronics' liability to $250

should Monitronics "be found liable for loss or damages caused by a failure of

[Monitronics] to perform any of its obligations under this agreement (including but

not limited to installation, maintenance, monitoring or service or the failure of the

---

[4] This ruling is the subject of Veasley's cross-appeal.

System or equipment in any respect whatsoever)." Thus, the limitation-of-liability clause may be interpreted as covering claims brought as a result of a failure to perform obligations under the contract. Although the next sentence refers to liability resulting from Monitronics' "performance or non-performance of the obligations imposed under this Agreement *or under law or from any negligence* of the part of [Monitronics]" (emphasis supplied), this language must be considered in context. See *Holmes v. Clear Channel Outdoor, Inc.*, 284 Ga. App. 474, 478 (2) (644 SE2d 311) (2007). Here, the contract section at issue, including the limitation-of-liability clause, focuses on Monitronics' performance under the contract and any resulting liability for its non-performance of such obligations, whether under a negligence theory or otherwise.

Although Monitronics argues for a much broader interpretation of the language referencing any negligence under the law, this Court has long recognized that a clause purporting to relieve a defendant of negligence liability with respect to every legal duty requires clear, explicit language expressing such an intent. "[A] clause having such broad consequences could be effective only by unambiguous language clearly expressing the intention of the parties to exculpate from liability for negligence of every kind." (Citations and punctuation omitted.) *Parkhill Trust Fund, Inc. v. Carroll*,

115 Ga. App. 108, 110 (1) (153 SE2d 615) (1967). And "[i]n cases of doubt, the contract will be construed most strongly against the one who prepares the instrument." (Citations and punctuation omitted.) Id. See also OCGA § 13-2-2 (5); *Holmes*, 284 Ga. App. at 477 (2) ("Ambiguities in exculpatory clauses are construed against the drafters.") (citation omitted). Thus, any ambiguity in the limitation-of-liability clause in this case must be construed against Monitronics.

Applying these principles, I find that the limitation-of-liability clause in this case is not sufficiently specific or explicit to preclude a negligence claim against Monitronics based on breach of an extra-contractual duty. See e. g., *DOT v. Arapaho Constr.*, 257 Ga. at 270 (finding exculpatory clause not sufficiently specific and unambiguous to cover claim based upon failure to provide right-of-way, where such a claim not specifically addressed in clause); *Holmes*, 284 Ga. App. at 477 (2) (finding that exculpatory clause, when considered in context, only provided for a waiver of claims if it did not invalidate insurance coverage); *DOT v. Dalton Paving & Constr., Inc.*, 227 Ga. App. 207, 219 (6) (a) (489 SE2d 329) (1997) (exculpatory clause did not preclude recovery of prejudgment interest for breach of contract claims against DOT, where language does not contemplate such a claim); *Altama Delta Corp. v. Howell*, 225 Ga. App. 78, 79-80 (1) (483 SE2d 127) (1997) (holding

6

exculpatory clause ambiguous where it conflicts with other provisions of party's agreement, precluding summary judgment where drafter of agreement not identified); *DOT v. APAC-Ga.*, 217 Ga. App. 103, 106 (3) (456 SE2d 668) (1995) (refusing to apply exculpatory clause to claim not contemplated by parties in contract); *Parkhill Trust Fund*, 115 Ga. App. at 110 (1) (construing exculpatory clause against lessor as drafter as not barring claim for injuries resulting from lack of repair). Accordingly, I agree with the majority that the limitation-of-liability clause does not bar Veasley's claim, albeit for a different reason, and would affirm.[5]

---

[5] The dissent reaches the conclusion that the limitation-of-liability clause covers Veasley's negligence claim but without analyzing the language of the limitation-of-liability clause. Moreover, *Steiner Corp. v. American District Telegraph*, 683 P2d 435, 439-440 (Idaho 1984), upon which the dissent relies, involves an exculpatory clause with materially broader language.

7

A13A0090, A13A0091. MONITRONICS INTERNATIONAL, INC.
v. VEASLEY; and vice versa.


DOYLE, Presiding Judge, concurring specially.

I concur in the judgment affirming the jury's award, but, for the reasons below,

I do not agree with all that is said.[1] Therefore, I concur specially.

As noted by the majority, Veasley dismissed her breach of contract claim

against Monitronics, and the trial court, prior to trial, expressly limited the scope of

the trial to address only whether Monitronics breached duties arising from its extra-

---

[1] In addition to the discussion below, I find the result in Division 3 overly harsh. Monitronics's notices of apportionment were filed 103 days (and not 120 days) prior to trial only because of the trial date chosen by the court *after* Monitronics had already filed its notices. While not reversible error, this case illustrates an unnecessary trap for the unwary resulting from the current statutory scheme established by the legislature in OCGA § 51-12-33 (d) (1).

contractual conduct. The trial court found the potential for such a breach based on an earlier representation by Monitronics's former counsel that Monitronics's contract did not require it to telephone Veasley. Therefore, the trial court concluded that any phone calls made to Veasley were voluntary undertakings outside the scope of the contract. Based on this theory, the trial court ruled that Monitronics could be subject to liability if it failed to exercise ordinary care with respect to making those phone calls, if it increased the risk of harm to her, or if it violated a self-imposed industry standard that required it to call its customer upon receiving an alarm signal.

I disagree that Monitronics's actions in making the phone calls to Veasley and her sister (a backup emergency contact Veasley had provided to Monitronics) fell outside the scope of the contract. The services Veasley contracted for "consist[ed] of the receipt, analysis[,] and response (dispatch of proper authorities) [sic] to signals from the System installed under [the] Agreement." It is undisputed that Monitronics made the phone calls as part of its response process prior to dispatching police to Veasley's residence. Accordingly, I believe the trial court erred by ruling that the phone calls were voluntary undertakings and not a part of the service Veasley paid for under the contract. Likewise, I believe that the trial court's pre-trial framing of the issues was erroneous.

2

Nevertheless, this was not fatal to the verdict and judgment. Generally, a breach of contract, with nothing more, does not give rise to a tort action because a "tort is the unlawful violation of a private legal right other than a mere breach of contract."[2] "To maintain an action in tort because of a breach of duty growing out of a contractual relation, the breach must be shown to have been a breach of [an independent] duty imposed by statute or a duty imposed by a recognized common law principle."[3] Thus, "a single act or course of conduct may constitute not only a breach of contract *but an independent tort as well*, if in addition to violating a contract obligation it also violates a duty owed to plaintiff independent of contract to avoid harming him."[4]

Here, because I believe Monitronics was not engaged in a voluntary undertaking, it did not owe her the duty of ordinary care associated with such acts.[5] But it still had a duty to Veasley independent of the contract because it was

---

[2] OCGA § 51-1-1.

[3] *Deacon v. Deacon*, 122 Ga. App. 513 (177 SE2d 719) (1970).

[4] (Emphasis supplied.) *Orkin Exterminating Co. v. Stevens*, 130 Ga. App. 363, 365 (203 SE2d 587) (1973).

[5] See, e.g., *Osowski v. Smith*, 262 Ga. App. 538, 540 (1) (586 SE2d 71) (2003) ("a person may be held liable for the negligent performance of a voluntary undertaking").

3

performing a service for her that was necessary for her protection. As stated in Section 323 of the Restatement (Second) of Torts,

> [o]ne who undertakes, gratuitously *or for consideration*, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.[6]

Therefore, based on the nature of the services provided by Monitronics, it had a duty to exercise reasonable care to avoid increasing the risk of harm to Veasley and to avoid causing harm to Veasley resulting from her reliance on Monitronics's services. Accordingly, the case was properly tried as a tort case, regardless of whether the conduct at issue arose out of the performance of the contract.

---

[6] (Emphasis supplied.) Cf. *Orkin Exterminating Co. v. Stevens*, 130 Ga. App. 363, 365 (203 SE2d 587) (1973) ("an independent harm may be found because of the relationship between the parties, or because of defendant's calling or because of the nature of the harm"), citing *E. & M. Construction Co. v. Bob*, 115 Ga. App. 127 (153 SE2d 641) (noting a duty of care independent of a contract).

4

Furthermore, despite erroneously characterizing Monitronics's phone calls as extra-contractual, the trial court nevertheless did not limit the actual trial proceedings to the purported extra-contractual conduct. The parties presented evidence outlining Monitronics's entire course of conduct (despite the trial court's prior delineation between the phone calls and other alarm services), and the jury was not limited in its consideration of the evidence. Also, the trial court instructed the jury as to the applicable duties and the general negligence standard of care, and the verdict form shows that the jury's findings were not predicated on an erroneous legal theory. Both parties agree in their briefing in the cross-appeal, in light of the way the trial played out and the way the jury was instructed, it was ultimately irrelevant whether or not the duties arose from extra-contractual conduct.[7] Therefore, the record before us does not require reversal.

---

[7] In Case No. A13A0091, Monitronics's brief states that "it is significant that the court instructed the jury that Monitronics had a duty to exercise ordinary care without limiting that duty to extra-contractual conduct. . . [B]ecause of the phrasing of the jury charge, Ms. Veasley cannot show harm" from the trial court's purported limitation of the issues at trial. Likewise, Veasley's brief states that "'because of the phrasing of the jury charge,' it does not matter to the jury's verdict whether Monitronics's duty to exercise ordinary care arose from a contractual duty or an assumed extra-contractual duty." I believe both parties are correct in this regard.

A13A0090, A13A0091.  MONITRONICS INTERNATIONAL,
    INC. v. VEASLEY; and vice versa.

ANDREWS, Presiding Judge, dissenting.

The contract for home security services between Velma Veasley and Monitronics International, Inc. contains a valid and enforceable limitation of liability clause which limits Monitronics's liability to $250 for the personal injury tort damages awarded by the jury in this case. The trial court erred by ruling that the clause is unconscionable, void, and against public policy, and by refusing to enforce the clause as a limit against the $8,640,000 judgment entered against Monitronics. Applying a different rationale, the majority opinion erroneously concludes that the limitation of liability clause is unenforceable because the clause is not sufficiently explicit or prominent compared to other portions of the contract. Because the limitation of liability clause is valid and enforceable, this case should be remanded to the trial court in Case No. A13A0090 with directions that the clause be enforced;

that the judgment amount of $8,640,000 be vacated; and that the amount of the judgment entered against Monitronics be reduced to $250. On condition that Monitronics accepts the judgment against it in the amount of $250, the judgment should stand affirmed.

Otherwise, the judgment should be reversed and a new trial awarded in Case No. A13A0090 because the trial court erroneously refused to give Monitronics's requested jury instruction on the defense of assumption of the risk. The majority opinion erroneously concludes that no assumption of the risk instruction was required because Veasley lacked "specific knowledge" that an intruder was in the house. To the contrary, the circumstantial evidence that Veasley knew an intruder was present, yet chose to stay in the house, was more than sufficient to require the trial court to give the requested instruction.

For these reasons, I respectfully dissent.

1. Under the home security system services contract at issue, Veasley paid $49 for "sale and installation" of the security system and agreed to pay $29.95 per month for monitoring services. Veasley entered into the contract in 1998 with Tel-Star Alarms, Inc, which assigned the contract to Monitronics. On the front of the contract signed by Veasley appears the statement:

2

Terms and conditions of this Purchase agreement appear on the back of this document.  Read them before you sign it.

The back of the contract is set out in 13 numbered paragraphs, each paragraph starting with a description of its contents set forth in bold type. The relevant portions of the paragraphs provide as follows:

Paragraph number four provides:

4.    WARRANTY LIMITATIONS AND EXCLUSIONS – Subscriber acknowledges that [Monitronics] is not an insurer and that all payments hereunder are based solely on the value of the System and service, as set forth herein, and are unrelated to the value of Subscriber's premises and possessions. Subscriber alone is responsible for purchasing any desired insurance. [MONITRONICS] HEREBY LIMITS THE DURATION OF ALL IMPLIED WARRANTIES TO ONE YEAR FROM THE DATE OF INSTALLATION OF THE SYSTEM.  FURTHER, [MONITRONICS] MAKES NO WARRANTY OF GUARANTEE (INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE) THAT THE EQUIPMENT OR SERVICES SUPPLIED WILL AVERT OR PREVENT OCCURRENCES OR THE CONSEQUENCES THEREFROM WHICH THE SYSTEM OR SERVICE IS DESIGNED TO DETECT OR AVERT.

Paragraph number five provides:

5.    DAMAGES – Subscriber acknowledges that it is impracticable and extremely difficult to fix the actual damages, if any, that might proximately result to Subscriber from either [Monitronics's] failure to perform any of the obligations under this agreement or the failure of the System to properly operate because of among other things:
        (a) the uncertain amount or value of property belonging to the Subscriber or others and kept on the premises which may be lost, stolen,

3

destroyed, damaged or otherwise affected by Occurrences which the System or service is designed to detect or avert.

(b) the uncertainty of the response time of any police or fire department, should the police or fire department be dispatched as a result of a signal being received or an audible device sounding.

(c) the inability to ascertain what portion, if any, of any loss would be proximately caused by [Monitronics's] failure to perform or by failure of its equipment to operate.

(d) the nature of the service to be performed by [Monitronics].

(e) the police or fire department or other organization to which the connection may be made or an alarm signal may be transmitted may invoke the provisions hereof against any claims by the Subscriber or by others due to any failure of such organization. Subscriber therefore agrees that if [Monitronics] should be found liable for loss or damages caused by a failure of [Monitronics] to perform any of its obligations under this agreement (including but not limited to installation, maintenance, monitoring or service or the failure of the System or equipment in any respect whatsoever), [Monitronics's] total liability shall be limited to $250.00. This liability shall be exclusive, and the provisions of this section shall apply to any loss or damage, regardless of cause, which results directly or indirectly from [Monitronics's] performance or non-performance of the obligations imposed under this Agreement or under law or from any negligence of the part of [Monitronics], its agents, employees, or assigns. EXCEPT FOR THE DAMAGES DESCRIBED IN THIS SECTION, [MONITRONICS] SHALL NOT BE LIABLE TO PURCHASER FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES. Some states do not allow the exclusion or limitation of incidental or consequential damages, so the above limitation or exclusion may not apply to you.

The provisions in the contract between Veasley and Monitronics plainly show a reasoned agreement to limit damages to $250 resulting directly or indirectly from Monitronics's performance or non-performance of obligations imposed under the

4

contract, or under law, or from any negligence of its agents or employees related to the contract.[1] The agreement to limit damages is based on a recognition that the agreed cost of the monthly monitoring fee ($29.95) is based on the value of the service rather than the nature of the occurrences the system is designed to detect or prevent and the risk of damages if those occurrences are not detected or prevented. Moreover, the parties agreed that no guarantee can be made that the system will detect or prevent the occurrences; and that, if damages occur, the amount is unpredictable and responsibility is difficult to assign. An agreement to limit damages on this basis facilitates the provision of home security services for an affordable price.

---

[1] The trial court found that the monitoring provisions in the contract were narrowly written, and that the only "response" required by contract after Monitronics received and analyzed the signal from Veasley's house was the "dispatch of proper authorities" as set forth in the contract. Accordingly, the negligence claim was tried to the jury on the basis that, when Monitronics contacted Veasley by phone, it assumed an extra-contractual duty, and, having assumed this duty, Monitronics could be held liable for negligence if it acted unreasonably, made Veasley's situation worse by increasing the danger, misled Veasley into the belief that the danger was removed, or deprived Veasley of the possibility of help from other sources. *Lau's Corp. v. Haskins*, 261 Ga. 491, 495 n. 2 (405 SE2d 474) (1991). This was a theory of liability based on duties similar to those set forth in Restatement (Second) of Torts § 323. The broad provisions of the limitation of liability clause in the contract are effective to limit liability for negligence under this theory. See *Steiner Corp. v. American District Telegraph*, 683 P2d 435, 439-440 (Idaho 1984) (limitation of liability provision in fire alarm system contract was sufficiently broad to limit liability on a negligence claim under Restatement (Second) of Torts § 323 related to the contract).

Especially given the competitive market for home security systems, the limitation of liability clause violates no public policy and is valid and enforceable.

> It is the paramount public policy of this state that courts will not lightly interfere with the freedom of parties to contract. A contracting party may waive or renounce that which the law has established in his or her favor, when it does not thereby injure others or affect the public interest. Exculpatory clauses in Georgia are valid and binding, and are not void as against public policy when a business relieves itself from its own negligence.

*Neighborhood Assistance Corp. &c. v. Dixon*, 265 Ga. App. 255, 256 (593 SE2d 717) (2004). "As a general rule[,] a party may contract away liability to the other party for the consequences of his own negligence without contravening public policy, except when such an agreement is prohibited by statute." *Lanier At McEver, L.P. v. Planners and Engineers Collaborative, Inc.*, 284 Ga. 204, 205 (663 SE2d 240) (2008); compare *Peck v. Rollins Protective Services, Inc.*, 189 Ga. App. 381 (375 SE2d 494) (1988) (contract clause limiting liability for negligent acts does not serve to limit liability for wilful and wanton conduct). There is no statute which prohibited Monitronics from limiting the consequences of its negligence to $250. Compare former OCGA § 13-8-2 (contracts contravening public policy). We reached this conclusion in a security system case in *West Side Loan Office v. Electro-Protective Corp.*, 167 Ga. App. 520 (306 SE2d 686) (1983), where Electro-Protective (EPC),

6

which provided burglar alarm systems, was sued by its customer for breach of contract and negligence based on the system's failure. The contract under which EPC provided the system stated that: "EPC is not assuming responsibility for any losses which may occur even if due to EPC's negligent performance or failure to perform any obligation under this Agreement." Id. (punctuation omitted). We held that the parties were free to contract to limit their rights and duties so long as no public policy was violated, and that "a party may exempt himself by contract from liability to the other party for injuries caused by negligence, and the agreement is not void for contravening public policy." Id. (punctuation and citation omitted). Applying these principles, we found that "[t]he exculpatory clause here is not contrary to public policy and bars appellant's breach of contract and negligence claims." Id.; *Stefan Jewelers, Inc. v. Electro-Protective Corp.*, 161 Ga. App. 385 (288 SE2d 667) (1982) (exculpatory clause in contract for burglar alarm system was not unconscionable and not void as against public policy). Moreover, limitation of liability clauses in home security system contracts are commonly found valid and enforceable by other courts. See Marjorie A. Shields, Validity, Construction and Application of Exculpatory and Limitation of Liability Clauses in Burglary, Fire, and Other Home and Business Monitoring Service Contracts, 36 ALR6th 305 (2008). Accordingly, the trial court

7

erred when it refused to enforce the limitation of liability clause on the basis that it was unconscionable or that it violated public policy.

There is no basis to invalidate the clause limiting liability for damages, as the majority opinion does, on a finding that the clause is not sufficiently explicit or prominent compared to other portions of the contract. First, the front side of the contract specifically refers to the terms and conditions on the back of the contract and states: "Read them before you sign it." Second, on the back of the contract, the clause limiting liability for damages is contained in paragraph 5 which is captioned in bold type with the word "DAMAGES." Third, all of the subparagraphs (a) through (e) in the damages paragraph are set apart from all of the other words on the page by being prominently indented – the only indented wording on the page. Fourth, and most importantly, subparagraph (e), which sets forth the clause limiting liability for damages to $250, concludes with a sentence in all bold type which specifically refers to and emphasizes the limitation of damages clause. That sentence states: "EXCEPT FOR THE DAMAGES DESCRIBED IN THIS SECTION, [MONITRONICS] SHALL NOT BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES." This sentence alone is sufficient to satisfy any requirement that "[p]rovisions severely restricting remedies act as exculpatory clauses and therefore

8

should be explicit, prominent, clear and unambiguous." *Imaging Systems International, Inc. v. Magnetic Resonance Plus, Inc.*, 227 Ga. App. 641, 644-645 (490 SE2d 124) (1997).

2. The trial court committed reversible error by refusing Monitronics's request to give the pattern jury charge on the defense of assumption of the risk.

The record shows that Veasley was attacked by an intruder hiding inside her house. There was persuasive circumstantial evidence that Veasley knew an intruder was in her house before she was attacked, yet she remained in the house despite having an opportunity to leave. This evidence was sufficient to require that the trial court give Monitronics's requested jury instruction on the defense that Veasley assumed the risk of the attack.

Veasley gave the following testimony relevant to this issue: Veasley lived alone in her house. Before Veasley opened the door to enter her house, the alarm system installed at the house triggered and she heard the siren go off inside the house. It was undisputed that Veasley's alarm system had a motion sensor inside the house. Nevertheless, Veasley entered the house, and turned off the alarm. Veasley then received a telephone call from Monitronics in response to the alarm during which the Monitronics representative speculated that the alarm sounded because the door she

9

entered did not have an alarm delay. Veasley knew this was incorrect because the door did have a delay, and she knew that "something was wrong." At that point, Veasley called and left a phone message for her sister that "something is not right." Veasley then went to her bedroom, where she saw that her bed "looked like someone had sat on it," and where she also saw a cell phone and a bottle of tequila which she knew did not belong to her and she had not left there. Veasley admitted that, after seeing the bed, the cell phone, and the bottle of tequila, she was concerned and knew that something was not right. Nevertheless, Veasley stayed in the house, went to the kitchen to make a sandwich, did some paperwork, and took a shower, after which the intruder came out of hiding and attacked her.

> The affirmative defense of assumption of the risk bars recovery when it is established that a plaintiff, without coercion of circumstances, chooses a course of action with full knowledge of its danger and while exercising a free choice as to whether to engage in the act or not. In Georgia, a defendant asserting an assumption of the risk defense must establish that the plaintiff (1) had actual knowledge of the danger; (2) understood and appreciated the risks associated with such danger; and (3) voluntarily exposed himself to those risks.

*Muldovan v. McEachern*, 271 Ga. 805, 807-808 (523 SE2d 566) (1999) (punctuation and citations omitted). The knowledge that a plaintiff who assumes the risk must possess is both actual and subjective knowledge "of the specific, particular risk of

harm associated with the activity or condition that proximately causes injury." *Vaughn v. Pleasent*, 266 Ga. 862, 864 (471 SE2d 866) (1996). "In the vast majority of cases, the plaintiff's consent to assume the risk is not express but rather is implied by his or her conduct." *Teems v. Bates*, 300 Ga. App. 70, 73 (684 SE2d 662) (2009). In other words, evidence sufficient to support a jury charge on the defense of assumption of the risk may be established by circumstantial evidence from which the jury can reasonably infer that the elements of the defense have been established. Id. at 72; *Boyce v. Gregory Poole Equip. Co.*, 269 Ga. App. 891 (605 SE2d 384) (2004) (circumstantial evidence may raise jury issue as to assumption of the risk). It follows that, even though assumption of the risk requires evidence that the plaintiff had subjective knowledge of the particular risk of harm, a jury is not compelled to accept a plaintiff's testimony that he was unaware of the particular risk of harm when there is circumstantial evidence sufficient to support a reasonable inference that he was aware. In the present case, before Veasley entered the house in which she lived alone, she heard the alarm triggered inside, then entered the house and discovered that her bed had been disturbed, and further discovered that a cell phone and a bottle of tequila were in her bedroom that she did not put there and did not belong to her. This was persuasive circumstantial evidence from which the jury could have reasonably

11

inferred that Veasley knew of the particular risk of being harmed by an intruder in her house, yet stayed in the house and assumed the risk of the attack.

"A charge on a given subject is justified if there is even slight evidence from which a jury could infer a conclusion regarding that subject." *Hendley v. Evans*, 319 Ga. App. 310, 311 (734 SE2d 548) (2012) (punctuation and citation omitted). "A trial court must instruct a jury on the law as to every controlling, material, substantial and vital issue in the case." *Duffield v. Chui*, 314 Ga. App. 214-215 (723 SE2d 506) (2012) (punctuation and citation omitted). And "[w]here it fails to give the benefit of a theory of the defense which is sustained by the evidence a new trial must be granted." *Berger v. Plantation Pipeline Co.*, 121 Ga. App. 362, 364 (173 SE2d 741) (1970) (punctuation and citation omitted). "The failure to charge on a properly asserted and legally cognizable theory of [defense], whether requested or not, or attention be called to it or not, is harmful as a matter of law." *Duffield*, 314 Ga. App. at 215 (punctuation and citation omitted); *Fowler v. Gorrell*, 148 Ga. App. 573, 577 (251 SE2d 819) 1978) (failure to charge on theory of the defense sustained by the evidence requires new trial).

Based on the evidence presented in the case, Monitronics requested that the trial court give the pattern jury instruction on the law of assumption of the risk:

12

> When a person knowingly and voluntarily takes a risk of physical injury, the danger of which is so obvious that the act of taking such risk, in and of itself, amounts to a failure to exercise ordinary care for one's own safety, that person cannot hold another liable for injuries proximately caused by such action even though the injuries may be in part attributable to the negligence of the other person.

Council of Superior Court Judges, Suggested Pattern Jury Instructions, Vol. 1, Civil Cases, Torts; Assumption of Risk, § 60.130 (2010). This instruction was a correct statement of the applicable law, adjusted to the evidence, and the trial court committed reversible error by refusing to give it.

3. The majority opinion does not address Veasley's cross-appeal in Case No. A13A0091. In the cross-appeal, Veasley contends that, in the event of a new trial, this Court should address the trial court's allegedly erroneous ruling that the only basis for tort liability was extra-contractual duties assumed by Monitronics. See n. 1, supra. To the extent the trial court so ruled, the record shows that Veasley sought the ruling and acquiesced in it during the trial. "A party may not complain on appeal of a ruling that he contributed to or acquiesced in by his own action, trial strategy, or conduct." *Holcomb v. State*, 268 Ga. 100, 103 (485 SE2d 192) (1997).

13