**FOURTH DIVISION**
**DOYLE, P. J.,**
**MILLER and DILLARD, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 11, 2014**

# In the Court of Appeals of Georgia

A14A0717. COMMUNITY & SOUTHERN BANK v. DCB
       INVESTMENTS, LLC et al.

DILLARD, Judge.

Community Southern Bank ("CSB") brought this action against DCB
Investments, LLC, David Belke, Glenn Couey, and Julie Couey (the latter three
collectively "defendants"), seeking a deficiency judgment pursuant to three
simultaneously executed promissory notes and guaranties. Following the denial of its
motion for summary judgment and the grant of summary judgment in favor of the
defendants, CSB appeals, arguing that the trial court erred in finding that CSB is
barred from seeking a deficiency judgment because it failed to obtain judicial
confirmation of an earlier foreclosure and in finding that this same failure also bars
it from recovering on the guaranties. For the reasons set forth *infra*, we affirm the trial

court's ruling that CSB cannot seek a deficiency judgment against the borrowers because it failed to comply with the judicial-confirmation requirements. However, we reverse the ruling that CSB is barred from recovering on the guaranties, and, thus, we reverse the denial of summary judgment to CSB on this issue.

At the outset, we note that summary judgment is only warranted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[1] If summary judgment is granted by a trial court, it enjoys no presumption of correctness on appeal, "and an appellate court must satisfy itself de novo that the requirements of OCGA § 9-11-56 (c) have been met."[2] And in our *de novo* review of a trial court's grant of a motion for summary judgment, we are charged with "viewing the evidence, and all reasonable conclusions and inferences drawn from the evidence in the light most favorable to the nonmovant."[3]

---

[1] OCGA § 9-11-56 (c).

[2] *Cowart v. Widner*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010).

[3] *Benefield v. Tominich*, 308 Ga. App. 605, 607 (1) (708 SE2d 563) (2011) (punctuation omitted); *see also Roberson v. Leone*, 315 Ga. App. 459, 460 (726 SE2d 565) (2012).

2

So viewed, the record shows that on February 13, 2009, Belke, Glenn Couey, Julie Couey, and DCB Investments, LLC (an entity controlled by Belke), executed three separate promissory notes with First Commerce Community Bank ("FCCB") for the purpose of developing real estate in Douglas and Carroll Counties. The first note (Loan No. 4000287300, "Note 1") named DCB as the borrower of a principal sum of $616,961.00, and indicated that its purpose was for renewal and the development of commercial real estate. Note 1 also indicated that it was secured by certain property in Douglas County and stated that it was "CROSSED WITH LOAN #'S 4000310300 & 400194800" ("Note 2 and 3," respectively). Accordingly, DCB executed a security deed, pledging the Douglas County property as security for Note 1.[4]

In a form identical to that of Note 1, Note 2 named Belke and both of the Coueys as borrowers of a principal sum of $1,012,708.93, and indicated that its purpose was similarly for renewal and the development of commercial land.

---

[4] This security deed was originally executed on April 21, 2008, as the Douglas property served as collateral for an earlier loan agreement between DCB and FCCB. Note 1 was a renewal of that earlier agreement. In fact, all three notes were renewals of earlier agreements between FCCB, DCB, Belke, and the Coueys, and, thus, the security deeds serving as collateral, discussed *infra*, were executed on dates earlier than February 13, 2009.

Additionally, Note 2 stated that it was secured by certain property in Carroll County and that it was "CROSS DEFAULTED WITH [Notes 1 and 3]." And pursuant to Note 2, Belke and the Coueys executed a security deed, pledging the Carroll County property as security.

In a form identical to the previous two, Note 3 designated Belke and both of the Coueys as borrowers of a principal sum of $1,600,543.92. Note 3 indicated that its purpose was for renewal and additional money for the development loan. It too was secured by the Carroll County property, via a security deed, which specifically noted that it was inferior to the deed pledging the same property as collateral for Note 2. Note 3 similarly indicated that it was cross defaulted with Notes 1 and 2.

On the same day that the three promissory notes were executed, Belke, Glenn Couey, and Julie Couey executed three separate guaranties of the notes. And finally, also on that same day, the parties executed two modification agreements, which pertained to the Carroll and Douglas County properties, respectively. The purpose of these agreements was to further ensure that all three notes were subject to cross-default and cross-collateralized, *i.e.*, that all three notes were secured by both the Carroll and Douglas County properties. Toward that end, for instance, the Douglas modification, in part, provides: "Lender has required as a condition to the extension

4

of credit evidenced by [Note 2] and [Note 3], that [Note 2] and [Note 3] also be secured by the [Douglas] Security Deed." In a similar fashion, the Carroll modification, in part, provides: "In addition to all other indebtedness described therein, the First [Carroll] Security Deed and the Second [Carroll] Security Deed shall secure payment of [Note 2], [Note 3], and [Note 1]." Both agreements also included provisions stating that a default under any one of the notes would constitute a default under all of the notes.

On June 1, 2009, FCCB, DCB, Belke, and the Coueys executed what they collectively characterized as the Assumption Agreement. Pursuant to that agreement, FCCB allowed Belke and the Coueys to transfer ownership of the Carroll County property to DCB, and, as a result, DCB assumed Belke and the Coueys' obligations as "borrower" on Notes 2 and 3. However, Belke and the Coueys' obligations under the separate personal guaranties remained intact. The Assumption Agreement also reconfirmed the parties' intention to cross-collateralize all three notes.

At some point thereafter, DCB defaulted on Note 1, and on April 6, 2010, FCCB foreclosed on the Douglas County property. The foreclosure sale garnered $734,558.88. It is undisputed, however, that FCCB did not seek judicial confirmation for that foreclosure sale. Then, nearly six months later, FCCB failed, and the Federal

5

Deposit Insurance Corporation ("FDIC") was appointed as receiver. Ultimately, pursuant to an agreement with the FDIC, CSB acquired all rights and possession of the subject notes, guaranties, and loan-related documents.

In November 2011, CSB notified DCB, Belke, and the Coueys that the notes were in default. Subsequently, on or about December 14, 2011, CSB foreclosed on the Carroll County property, and the foreclosure sale garnered $1,980,000.00 Thereafter, CSB filed an application for judicial confirmation of that foreclosure sale in the Superior Court of Carroll County, which the court granted on March 1, 2012.

Less than one week after obtaining judicial confirmation of the foreclosure sale of the Carroll County property, CSB filed suit against DCB, Belke, Glenn Couey, and Julie Couey, alleging breach of all three of the promissory notes and guaranties and seeking, *inter alia*, a deficiency judgment. And although it indicated that it was seeking such a judgment pursuant to all three of the notes, as well as the foreclosure sale of the Carroll County property, CSB's complaint made no mention of the Douglas County property, which originally secured Note 1, or the foreclosure sale of that property.

Belke and the Coueys filed answers,[5] and the parties engaged in discovery. Subsequently, the parties filed cross motions for summary judgment. And after a hearing and supplemental briefing by both parties, the trial court denied CSB's motion and granted summary judgment in favor of defendants. Specifically, the trial court found that CSB was barred from seeking a deficiency judgment because it failed to obtain judicial confirmation of the foreclosure sale of the Douglas County property and that this same failure also barred it from recovering on the personal guaranties. This appeal follows.

1. CSB contends that the trial court erred in finding that its failure to obtain judicial confirmation of the foreclosure sale on the Douglas County property associated with Note 1 barred it from seeking a deficiency judgment on Notes 2 and 3, arguing that the debts represented by the three notes are not inextricably intertwined. We disagree.

Under Georgia law, a deficiency judgment is "the imposition of personal liability on mortgagor for unpaid balance of mortgage debt after foreclosure has failed

---

[5] CSB dismissed DCB without prejudice, and, therefore, DCB is no longer a party in this matter.

7

to yield full amount of due debt."[6] And the requirements for obtaining such a judgment are delineated in OCGA § 44-14-161 (a), which provides:

> When any real estate is sold on foreclosure, without legal process, and under powers contained in security deeds, mortgages, or other lien contracts and at the sale the real estate does not bring the amount of the debt secured by the deed, mortgage, or contract, no action may be taken to obtain a deficiency judgment unless the person instituting the foreclosure proceedings shall, within 30 days after the sale, report the sale to the judge of the superior court of the county in which the land is located for confirmation and approval and shall obtain an order of confirmation and approval thereon.

As our Supreme Court has noted, the purpose of this legislation "was stated to limit and abate deficiency judgments in suits and foreclosure proceedings on debts."[7] Thus,

---

[6] *Iwan Renovations, Inc. v. N. Atlanta Nat'l Bank*, 296 Ga. App. 125, 127 (1) (673 SE2d 632) (2009) (punctuation omitted); *see Hill v. Moye*, 221 Ga. App. 411, 412 (1) (471 SE2d 910) (1996) (noting that a deficiency judgment is a judgment for that part of a debt secured by a mortgage not realized from a sale of the mortgaged property).

[7] *First Nat'lBank & Trust Co. v. Kunes*, 230 Ga. 888, 890 (199 SE2d 776) (1973) (punctuation omitted); *see also Bank of N. Ga. v. Windermere Dev., Inc.*, 316 Ga. App. 33, 37 (728 SE2d 714) (2012) ("This statute, which was enacted in 1935 during the Great Depression, was intended to relieve debtors from the economic depression of the times . . . . [T]he aim of the legislation was stated to limit and abate deficiency judgments in suits and foreclosure proceedings on debts.") (citation and punctuation omitted).

8

as made clear by the plain meaning of the relevant statutory text, before a creditor is entitled to file an action to obtain a deficiency judgment against a debtor, it must report the foreclosure sale to and obtain confirmation of the sale from the superior court of the county where the foreclosed land was located by demonstrating that the sale was lawfully conducted and brought at least the fair-market value of the land on the date of the sale.[8]

Importantly, this Court has applied OCGA § 44-14-161(a) to "foreclosure proceedings on separate debts which are inextricably intertwined to prevent creditors from circumventing the statute's mandates by making successive loans against the security of the same property."[9] Such an application prevents creditors from avoiding the central dictates of the confirmation statute, which are there to "protect debtors from deficiency judgments when their property is sold at a foreclosure sale for less than its market value."[10] And as a general rule, "two debts that are incurred for the

_____

[8] *See Bank of N. Ga.*, 316 Ga. App. at 38 (1); OCGA § 44-14-161 (b), (c).

[9] *Iwan Renovations, Inc.*, 296 Ga. App. at 128 (1).

[10] *Id.* (punctuation omitted).

9

same purpose, secured by the same property, held by the same creditor, and owed by the same debtor are inextricably intertwined."[11]

Here, although there were three separate promissory notes that were secured by two separate parcels of property, all three notes were executed on the same date by DCB, Belke, the Coueys, and the same creditor (FCCB) and were executed for the same purpose of developing the properties at issue. In addition, each note contained cross-default language that specifically referenced the other two notes. Furthermore, as previously noted, to unequivocally ensure that all three notes were subject to cross-default and cross-collateralized, on the same day that the notes were executed, the parties also executed the two modification agreements, which explicitly stated that both the Douglas and Carroll County properties secured all three notes. Given these circumstances, we conclude that the three notes were indeed inextricably intertwined.[12] Accordingly, the trial court did not err in finding that CSB's failure to

---

[11] *Id.*; *accord Bank of N. Ga.*, 316 Ga. App. at 38 (1); *Tufts v. Levin*, 213 Ga. App. 35, 39 (2) (443 SE2d 681) (1994).

[12] *See Bank of N. Ga.*, 316 Ga. App. at 39 (1) (holding that because mortgages and letters of credit both were used for purpose of developing properties subject to mortgage, were held by the same creditor, and were secured by the same property, debts were inextricably intertwined such that mortgagee's action against mortgagors was a suit for deficiency judgment and was barred by mortgagee's failure to obtain judicial confirmation of foreclosure sale); *Iwan Renovations, Inc.*, 296 Ga. App. at

obtain judicial confirmation of the foreclosure sale of the Douglas County property barred it from seeking a deficiency judgment from the borrowers on the notes.

2. CSB also contends that the trial court erred in finding that its failure to obtain judicial confirmation of the foreclosure sale on the Douglas County property likewise barred it from recovering on the personal guaranties. We agree.

At the outset, we note that Georgia's appellate courts are required to construe agreements in a manner that "respects the parties' sacrosanct freedom of contract."[13] Indeed, it is well settled that contracts will not be avoided by the courts as against public policy, "except where the case is free from doubt and where an injury to the

---

129 (1) (holding that two debts were inextricably intertwined given the fact that notes were incurred only seven months apart for the same purpose, both deeds pertained to same property, were held by same creditor, and contained cross-default clauses). *Compare Lawson v. Habersham Bank*, 233 Ga. App. 88, 91-92 (503 SE2d 341) (1998) (finding that mortgagee's attempt to foreclose on mortgagors' home after foreclosing on their farm, pursuant to a consolidated loan secured by both properties, was not an action for a deficiency judgment, but was a separate contractual remedy not barred by mortgagor's failure to obtain judicial confirmation of foreclosure on home).

[13] *Monitronics Int'l, Inc. v. Veasley*, 323 Ga. App. 126, 134-135 (746 SE2d 793) (2013) (physical precedent only as to Division 2); *see also Duncan v. Integon General Ins. Corp.*, 267 Ga. 646, 650 (482 SE2d 325) (1997) ("Georgia has historically afforded great protection to the freedom to contract with another person. Georgia courts are thus bound to enforce contracts as made so long as they are not contrary to law or public policy.").

11

public interest clearly appears."[14] Consequently, a guarantor may consent in advance to a course of conduct which would otherwise result in his discharge, "and this includes the waiver of defenses otherwise available to a guarantor."[15]

In the case *sub judice*, Belke's guaranty, in relevant part, provides:

1. No act or thing need occur to establish the liability of Undersigned, and no act or thing, except full payment and discharge of all indebtedness, shall in any way exonerate Undersigned or modify, reduce, limit or release the liability of the Undersigned hereunder.

4. The liability of the Undersigned shall be limited to a principal amount of $ Unlimited (if unlimited or if no amount is stated, the Undersigned shall be liable for all indebtedness, without any limitation as to amount), plus accrued interest thereon and all attorneys' fees, collection costs and enforcement expenses referable thereto. Indebtedness may be created and continued in any amount, whether or not in excess of such principal amount, without affecting or impairing the liability of the Undersigned. The Lender[16] may apply any sums received by or available to Lender on account of the Indebtedness from Borrower or any other person (except the Undersigned), from their properties, out of any collateral security or

[14] *Id.* (punctuation omitted).

[15] *HWA Props., Inc. v. Cmty. & S. Bank*, 322 Ga. App. 877, 887 (2) (b) (746 SE2d 609) (2013) (punctuation omitted).

[16] The guaranty identifies the "Lender" as FCCB and its "participants, successors and assigns," which includes CSB.

12

from any other source to payment of the excess. Such application of receipts shall not reduce, affect or impair the liability of the Undersigned hereunder. . . .

6. . . . The liability of the Undersigned shall not be affected or impaired by any of the following acts or things (which Lender is expressly authorized to do, omit or suffer from time to time, both before and after revocation of this guaranty, without notice to or approval by the Undersigned): (i) any acceptance of collateral security, guarantors, accommodation parties or sureties for any or all indebtedness; . . . (iii) any waiver, adjustment, forbearance, compromise or indulgence granted to Borrower, any delay or lack of diligence in the enforcement of Indebtedness, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any Indebtedness; (iv) any full or partial release of, settlement with, or agreement not to sue, Borrower or any other guarantor or other person liable in respect of any Indebtedness; (v) any discharge of any evidence of Indebtedness or the acceptance of any instrument in renewal thereof or substitution therefor; (vi) any failure to obtain collateral security (including rights of setoff) for Indebtedness, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to protect, insure, or enforce any collateral security; (vii) any foreclosure or enforcement of any collateral security[.] . . .

7. The Undersigned waives any and all defenses, claims and discharges of Borrower, or any other obligor, pertaining to Indebtedness, except the defense of discharge by payment in full. Without limiting the generality

of the foregoing, the Undersigned will not assert, plead or enforce against Lender any defense of waiver, release, statute of limitations, res judicata, statute of frauds, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to Borrower or any other person liable in respect of any Indebtedness, or any setoff available against Lender to Borrower or any such other person, whether or not on account of a related transaction. The Undersigned expressly agrees that [he] shall be and remain liable, to the fullest extent permitted by applicable law, for any deficiency remaining after foreclosure of any mortgage or security interest securing Indebtedness, whether or not the liability of Borrower or any other obligor for such deficiency is discharged pursuant to statute or judicial decision. The Undersigned shall remain obligated, to the fullest extent permitted by law, to pay such amounts as though the Borrower's obligations had not been discharged.

The guaranties executed by Glenn and Julie Couey were identical to each other—although they contained language somewhat different than Belke's guaranty—and, in relevant part, provide:

1. . . . This Guaranty may be enforced by the Lender against the Guarantor without the necessity at any time of the Lender's resorting to or exhausting any other security or collateral now or hereafter pledged, assigned, or granted to the Lender and without the necessity at any time of the Lender's having recourse against the Borrower on the Note or against the Land through foreclosure proceedings under the Security Deed or otherwise. . . .

14

2. . . . Without limiting the generality of the foregoing, the Guarantor gives its consent for the Lenders to do any one or more of the following without in any manner affecting, impairing, limiting, modifying or releasing any of the obligations of the Guarantor under this Guaranty and without notice to or consent of the Guarantor (a) exchange, compromise, or surrender the whole or any part of the security now or hereafter held for the Indebtedness, (b) exchange, extend or renew the time or place of payment of the Indebtedness in whole or in part, to a time certain or otherwise whether or not longer than the original period, or withdraw credit or time to pay, (c) extend or change the terms of performance of any other obligations of the Borrower under the Loan Documents, (d) modify, amend, or waive any of the provisions of the Loan Documents, (e) release or grant indulgences to the Borrower, any co-guarantor, or any party to the Loan Documents, (f) receive additional property or other security as collateral for the Indebtedness, (g) fail to exercise due diligence or omit to enforce any right, power, or privilege under the Loan Documents, and (h) apply any payment received by the Lender from the Borrower of, or on account of, the Indebtedness, in any manner the Lender elects.

3. Waiver of Rights. The Guarantor expressly waives (a) notice of the execution and delivery of the Loan Documents and creation of the Indebtedness, (b) notice of acceptance of this Guaranty by the Lender and of all extensions of credit to the Borrower by the Lender, (c) presentment and demand for payment of any of the Indebtedness, (d) protest and notice of dishonor or of default or nonpayment to the Guarantor or to any other party with respect to the Indebtedness or with

15

respect to any security therefor, (e) notice of the Lender's obtaining, amending, substituting for, releasing, waiving, or modifying any security interest, liens, or encumbrances now or hereafter securing the Indebtedness, or the Lender's subordinating, compromising, discharging, or releasing such security interests, liens, or encumbrances and any other notices whatever, (f) the defense of impairment of collateral, (g) demand for payment under this Guaranty, (h) the provisions of Section 10-7-24 . . . , and (i) all rights of subrogation, indemnification, contribution and reimbursement from the Borrower, all rights to enforce any remedy the Lender may have against the Borrower, and any benefit of, or right to participate in, any collateral or security now or hereafter held by the Lender in respect of the Indebtedness, even upon payment in full of the Indebtedness.

A review of the language contained in these respective guaranties demonstrates that both include an express waiver of any and all defenses to Belke and the Coueys' liability on the notes. In fact, Belke's guaranty specifically provides that he shall remain liable *for any deficiency remaining* after the foreclosure of any property securing the note, whether or not the liability of Borrower or any other obligor for such deficiency is discharged pursuant to statute or judicial decision. Similarly, the guaranties executed by the Coueys include language specifically stating that CSB may enforce the guaranty without the necessity at any time of CSB having recourse against the Borrower on the Note or *against the Land through foreclosure*

16

*proceedings* under the Security Deed. Given the aforementioned provisions, we conclude that CSB's failure to obtain a valid confirmation of the foreclosure sale, pursuant to OCGA § 44-14-161, does not "impair its authority to collect the difference between the amount due on the note and the foreclosure sale proceeds from [Belke and the Coueys] based upon [their] personal [guaranties]."[17] Accordingly, the trial court erred in granting the defendants' motion for summary judgment and in denying CSB's motion as to this specific issue.

*Judgment affirmed in part and reversed in part. Doyle, P. J., and Miller, J., concur.*

---

[17] *HWA Props., Inc.*, 322 Ga. App. at 888-89 (2) (b); *see also Gen. Motors Acceptance Corp. v. Newton*, 213 Ga. App. 405, 406-07 (444 SE2d 805) (1994) (holding that the failure to confirm a nonjudicial foreclosure sale pursuant to a security deed does not prevent a creditor from seeking to enforce a contractual right to recover against additional security on the debt).